Michael T. **CALLAHAN**, Petitioner,

v.

Russell E. **LASH**, Warden of the Indiana State Prison, Respondent.

Civ. No. 4032.

United States District Court,
N. D. Indiana,
South Bend Division.

Sept. 13, 1974.

Terry V. Lehr, Crumpacker, May, Levy & Searer, South Bend, Ind., Ferdinand Samper, Sr., Samper & Samper, Indianapolis, Ind., for petitioner.

Darrel K. Diamond, A. Frank Gleaves III, Deputy Attys. Gen., State of Indiana, Indianapolis, Ind., for respondent.

## MEMORANDUM

GRANT, District Judge.

This pro se Habeas Corpus Petition was originally filed on June 14, 1967. Thereafter, appointed counsel advised this court that the petitioner had for many months been confined as a mental patient in the Dr. Norman Beatty Memorial Hospital, Westville, Indiana, and that, in the opinion of the treating physicians, the petitioner was not then capable of intelligently participating in any evidentiary hearing. A full staff report

from the hospital reaffirmed these facts and, in light of the suggestion that petitioner's condition might continue for an indefinite period of time, this petition was dismissed without prejudice to reinstatement at such later time as the petitioner "is found to be capable of taking part and assisting in the prosecution of this action . . . ." Following petitioner's subsequent release from said hospital, this action was reinstated, new counsel for the petitioner appointed by this court, and the petition scheduled for an evidentiary hearing on March 21, 1973.

This Habeas Corpus Petition is now before this court for determination on two grounds,[1] (1) that the petitioner was deprived of his constitutional right to competent counsel, and (2) that the publicity and the conditions of the courtroom created an atmosphere that deprived him of his Sixth Amendment right to a fair trial as demanded by the due process clause of the Fourteenth Amendment.

Petitioner was indicted and found by a jury to be guilty of the 1961 murder of Officer Edward G. Byrne of the Marion County, Indiana, Sheriff's staff, in the perpetration of a burglary. Following judgment and sentencing, the defendant (petitioner herein) filed a motion for a new trial, asserting as grounds in support thereof (1) that the finding of the jury was not sustained by sufficient evidence and (2) error of the Court in the conduct and supervision of the trial, and other grounds not pertinent to this proceeding. Following denial of that motion, defendant appealed and the judgment was affirmed by the Supreme Court of Indiana, 246 Ind. 65, 201 N.E.2d 338. Over two years later, Callahan was back before the Supreme Court of Indiana with an original proceeding for Writ of Certiorari to review the action of the Marion County (Indiana) Criminal Court in denying him permission to file a belated motion for new trial. That Petition for Writ of Certiorari was denied. 247 Ind. 350, 214 N.E.2d 648.

The murder of Officer Byrne occurred on a Sunday morning, April 16, 1961. Byrne had gone to the Hilltop Tavern, in the suburbs of the City of Indianapolis, to investigate a report concerning three men who were seen in the vicinity of the tavern under suspicious circumstances. Officer Byrne apprehended the three men in an automobile as they were leaving the tavern. He caused them to get out of their car and approach his patrol car where he, still seated under the steering wheel of his car, proceeded to write down information from the license of the member of that threesome who was the driver of the get-away car. There was testimony at the trial that during this questioning procedure, Callahan (one of the three) walked to the side of the patrol car, thrust a gun through the open window and fired eight shots at close range into the body of the officer, killing him. The three men escaped and Callahan was apprehended two days later in the attic of a Johnson County farmhouse following an intensive manhunt in that central Indiana area.

As might be expected, this case was the subject of many news stories in the three Indianapolis newspapers, including headlines, pictures, and editorial comment during the several days following the murder, the two-day manhunt, and the funeral of the slain Deputy Sheriff. It should be noted here that the trial in the Criminal Court in Marion County (Indianapolis) did not take place until March 19, 1962—some eleven months later. At that trial, defendant was represented by retained counsel. Retained counsel, in compliance with Indiana's statutory requirements, filed a notice of alibi and called witnesses to show that the defendant was "elsewhere" than near the Hilltop Tavern at the time of the killing of Officer Byrne. However, both

---

1. The original petition contained five grounds in support thereof. At final argument and in his post-hearing brief, petitioner narrowed his claims to three. The respondent replied that the claim of waiver would not be raised, so the final issues herein are thus narrowed to two.

of petitioner's two accomplices in the crime took the stand during the trial and testified that Callahan had killed the Deputy. Several other occurrence witnesses placed Callahan and the other two men at the scene of the crime.

We turn first to the allegation that the publicity and the conditions of the courtroom created an atmosphere that deprived petitioner of his Sixth Amendment right to a fair trial as demanded by the due process clause of the Fourteenth Amendment.

■ As noted above, this case was the subject of many news stories in the three Indianapolis newspapers, including headlines, pictures and editorial comment during the several days following the murder, the two-day manhunt and the funeral of the slain Deputy Sheriff. In fact, fifty of the 118 news articles which were collected and admitted herein as Court's Exhibit No. 1, were published in the two-week period following the murder, i. e., between April 16th and April 30th, 1961. During the eight-month period that followed, i. e., from June, 1961, and continuing through the month of January, 1962, there were a total of only thirteen articles in all three Indianapolis papers combined. Based upon that eight-month interval in time, and if petitioner's subsequent trial had been conducted in an atmosphere of "judicial serenity and calm to which petitioner was entitled," [2] we would find it difficult indeed to make a finding of prejudice resulting from pre-trial publicity because, as the Second Circuit spoke in United States v. Bowe: [3]

> [T]he importance of this time-lag cannot be overlooked. Both the Supreme Court and this court have indicated that the length of time between the publication of adverse publicity and the empaneling of the jury is a significant factor in assessing claims of prejudice resulting from pretrial publicity. (Cases omitted.) Since the

articles involved here were twelve weeks old at the time the jury was empaneled, it is highly unlikely that they were retained in the memories of the jurors. As Judge Weinfeld has pointed out, it is a fact that "frequently in this large metropolitan district, prospective jurors show little recall of past widely publicized matters * * *."

We stated above that the publicity of April and May, 1961, standing alone, would not be sufficient in our judgment, to support a claim of a denial of procedural due process at the March, 1962, trial. However, when viewed as a part of the totality of circumstances surrounding the March, 1962, trial, it becomes quite another matter. That publicity "must [now] be considered against the setting in which the trial was held".[4] That trial, if it can be so termed, took on the atmosphere of a circus and by the prominence given the trial by the number of newsmen, including cameramen, who roamed the courtroom, apparently at will, all those headlines, pictures, and editorial comments of April, 1961, came back to life in the minds of the jurors and the community from which they were drawn.

The testimony of witnesses at this habeas corpus hearing together with the 100-odd news stories admitted into evidence as Court's Exhibit No. 1, disclose the following:

There was uncontroverted testimony at the hearing that there were from 10 to 20 armed guards in the courtroom—many of them in uniform. The guard standing at the main entrance into the courtroom carried a shotgun; others wore side arms. It was testified that other armed guards stood "one at each end of the jury box, one at the rear door behind the judge's bench, then the one at the front door with the shotgun, and then, if I recall, there was one on the other wall behind the defense table".

2. Estes v. Texas, 381 U.S. 532, 536, 85 S.Ct. 1628, 1629, 14 L.Ed.2d 543.

3. 360 F.2d 1.

4. Sheppard v. Maxwell, 384 U.S. 333, 354, 86 S.Ct. 1507, 1518, 16 L.Ed.2d 600.

When asked how many TV stations had cameras in the courtroom, it was testified, "I couldn't say for sure, but there was—there is only four channels down there and there was more cameras than that. So evidently some of them had other cameras for different profile shots or something".

There was testimony of "flashbulbs popping" and photographers moving around "behind the jury" and "behind the judge's bench there was room and they would use that as a place to change their positions". Further, that scenes from the courtroom were being shown on TV news programs on "just about every channel . . . . It was the number one thing on the news program."

Court's Exhibit No. 1, supra, includes the following articles written during the trial—each carrying pictures taken in the courtroom during the proceedings:

March 9, 1962—Indianapolis News (Front page of news section)— Article showing full-length picture of petitioner with handcuffs and leg irons as he was brought back from the Indiana State Reformatory to the Marion County jail to begin his trial for the slaying of the Deputy Sheriff. During the first three days of trial, while the jury was being empaneled, the petitioner was brought into the courtroom, in the presence of the jury, shackled with handcuffs and leg irons. All of this in view of the news and TV cameras hereinabove referred to.[5] (Exhibit #54.)

March 19, 1962—Indianapolis News— Front page—Picture of jury and counsel as Deputy Prosecutor "questions prospective jurors". (Exhibit #92.)

March 19, 1962—Indianapolis Times— In a two-column news story headed "Two Oppose Death at Callahan Trial" appears the following:

"Eleven Deputy Sheriffs were in the courtroom today when Callahan appeared at the opening of his trial in the death of Deputy Sheriff Edward Byrne last April 16. * * *

"Four of the Deputies in the courtroom today were in uniform. Seven, including two sitting in the crowd, were in plainclothes. All exits from the courtroom were guarded by them." (Exhibit #39.)

March 22, 1962—Indianapolis Times— Picture of presiding judge giving preliminary instructions to jury, with names and addresses of the jurors. (Exhibit #78.)

March 22, 1962—Indianapolis News— Seven-column-wide picture across top of front page, showing jurors seated in jury box with all names and addresses. (Exhibit #96.)

March 23, 1962—Indianapolis Times— Picture of the presiding judge with the following lead, "Judge Richard M. Salb took time out from the Michael T. Callahan murder trial to announce his candidacy for renomination, etc." (Exhibit #67.)

The Indianapolis Star on that same day, alongside a four-column story on the murder trial captioned "Slain Deputy's Widow Testifies", stated that Judge Salb made his announcement for re-election "during a recess in the first-degree murder trial of Michael T. Callahan, etc." The Indianapolis Star article further stated that if re-elected Salb pledged to:

1. "Continue the ever-present war against organized and syndicated crime, both of which are practically non-existent in our country at the present time.

2. "Continue to enforce my policy regarding teenage defendants, that is: 'for an adult crime, an adult punishment'.

3. "Continue to investigate and abolish 'credit' bonding practice, and tighten bond requirements on repeat offenders.

4. "Continue to apply the general maxim which I feel best describes the function of a Criminal Court judge, 'to exert authority without

---

5. It should be noted that on the third day, counsel objected and thereafter petitioner's handcuffs and leg irons were removed and reapplied outside the courtroom.

destroying freedom'." (Also Exhibit #67.)

March 28, 1962—Indianapolis News—Four pictures of co-defendant DuBois "sobbing from the witness stand after relating how his former buddy . . . . Callahan shot Deputy Sheriff Byrne to death". (Exhibit #84.)

March 28, 1962—Indianapolis News—Below headline which reads "Second Pal Names Callahan as Slayer", is a picture—front page—with caption, "Overflow in Courtroom. Spectators Improvise to Hear Testimony in Michael Callahan Murder Trial." (Exhibit #97.)

March 30, 1962—Indianapolis News—5″x11″ picture of Prosecuting Attorney and Callahan jury during final argument. (Exhibit #88.)

March 30, 1962—Indianapolis Times—Picture of Prosecuting Attorney in closing argument before the jury. (Exhibit #95.) ,

Following the above-listed pictures and news stories, there then appeared on the front page of the March 30, 1962, issue of the Indianapolis Star (Exhibit #98–A), the following article which is quoted verbatim:

"CALLAHAN DECLINES TO TAKE STAND: CASE MAY GO TO JURY TODAY

"The state prepared its final drive for the death penalty for Michael T. Callahan last night after his defense ended yesterday like the collapse of a giant balloon.

"With the surprise announcement about noon that the defense would rest without the alleged killer of Deputy Sheriff Edward G. Byrne taking the stand, the jury of seven men and five women was excused for the remainder of the day.

"Today, they will hear the closing arguments and retire to deliberate Callahan's fate.

"It was after the fourth of the 37-year-old ex-convict's 'alibi' witnesses, all women, took the stand in Marion Criminal Court, Division 1, that Callahan's lawyer, Joseph T. Mazelin, requested of Judge Richard M. Salb:

" 'I would like to ask the courtesy of the court to have a short intermission for time to consult with my client, who will be the next and the last witness for the defense.'

"But when the paunchy Callahan returned to the courtroom, his eyes wide and nervous, Mazelin startled the jury with the announcement that 'the defense will rest'.

"Then breaking the silence, he added quickly:

" 'I'll have to admit, it was a last-minute decision.'

"He indicated later that the decision was 'Callahan's alone . . . he didn't want to take the abuse of cross-examination'."

It is very possible that some of the conditions related by petitioner's witnesses, or as appeared in the 100 or so news stories were exaggerated but, regretfully, the respondent did not see fit to produce a single witness or introduce one bit of evidence to defend against the challenge of this habeas corpus petition. Thus, we are forced to the conclusion that, if petitioner's trial had, in fact, been conducted in an atmosphere of "judicial serenity and calm", with proper respect for the rights of the defendant, and if the trial court had made proper inquiry of, and had properly admonished that unsequestered jury concerning all those current news stories and news programs,[6] we would, under such a set

---

6. During final argument following the habeas corpus hearing, the following colloquy took place between the court and Darrel K. Diamond, Indiana Deputy Attorney General, who argued for the respondent:

THE COURT: Was the jury sequestered?

MR. DIAMOND: They were not, your Honor. However, we believe that any proper

admonition would have informed them that they should not examine any newspaper articles relevant to the case and—

THE COURT: *Do we know when that proper admonition was given?*

MR. DIAMOND: *It is not completely clear from the record,* your Honor.

of circumstances, or any of them, had the benefit of testimony from some one, or possibly more, of all those people who were connected with the State in that highly publicized trial of twelve years ago. Nor is respondent's brief of any assistance. After stating that, "The allegations presented by the petitioner in this case have been greatly exaggerated," the brief then seeks to average out the number of news stories over the number of days involved, in a fruitless effort to prove that the average wasn't great and, therefore, there was not that "continuous prejudicial publicity such as would inflame the community".

■ The due process requirements of both the Fifth and Fourteenth Amendments and the provisions of the Sixth Amendment guarantee a defendant a fair trial and require that procedures for the news media's access to the courtroom assure such a trial. Estes v. Texas, 381 U.S. 532, 540, 85 S.Ct. 1628, 14 L.Ed. 2d 543 (1965). The basic guideline for trial under our legal system was best stated by Justice Holmes over half a century ago in Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907):

> The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

"[T]he atmosphere essential to the preservation of a fair trial the most fundamental of all freedoms—must be maintained at all costs." Estes, supra, 381 U.S. at 540, 85 S.Ct. at 1632. "[T]rials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." Bridges v. California, 314 U.S. 252, 271, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941). "While maximum freedom must be allowed the press in carrying on this important function (informing the citizenry of court proceedings) in a democratic society, its exercise must necessarily be subject to the maintenance of absolute fairness in the judicial process." Estes, supra, at 539, 85 S.Ct. at 1631. The Supreme Court has noted further that while freedom to discuss must be provided, it cannot divert the trial from its purpose of adjudicating controversies in the calmness and solemnity of the courtroom. Sheppard v. Maxwell, 384 U.S. 333, 350–351, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). The trial judge can preserve this atmosphere by setting regulations for the news media's use of the courtroom and continuing or transferring the action and ordering sua sponte that the jury be sequestered during the trial. Sheppard, supra, 384 U.S. at 357–363, 86 S.Ct. 1507.

■ As in the Sheppard case, the trial attacked in this petition was conducted in an excessively cluttered courtroom and in the wake of early, massive publicity which often emphasized incriminating matters which were not part of the evidence later introduced at trial,[7]

---

7. Court's Exhibit No. 1 contains many newspaper articles which disclosed matters incriminating the petitioner which were never introduced as evidence at trial. Among them were the following: During the manhunt for the petitioner, one article quoted his mother as saying, "The best thing for him would be just to kill himself." Other articles detailed his criminal record; one referred to a "life of crime" which began at age 12 and another article noted "two seven-year hitches" which the petitioner served in the Indiana Reformatory. While petitioner was awaiting trial, articles appeared which linked him with other crimes that had occurred in the area. One of them noted that a man who confessed to 50 burglaries stated that the loot was "fenced" through the petitioner;

and another article stated that at the trial of a man who was convicted of holding up a credit union, an FBI agent testified that that defendant told them that this petitioner drove the get-away car. Finally, there were many articles which placed petitioner in the criticism and controversy over the bail bonding procedure in the county. Shortly after the Deputy Sheriff's murder, many articles appeared in the papers criticizing the fact that the day before the shooting, petitioner had made bail on a robbery charge for only $7,500 and that a federal detainer which would have prevented his release had been misplaced. The headlines of one front-page story asserted, " 'Misplaced' U. S. Detainer Might Have Saved Deputy". Another article declared, "The brutal murder of Sheriff's Deputy Ed-

and included the publication of the prospective jurors' names the day before the trial.[8] The trial in question bore greater resemblance to a "Roman Holiday"[9] than that atmosphere of "judicial serenity and calm" to which petitioner was entitled under the Constitution.

■ Additionally, this trial was filmed for television with more than four cameras in the courtroom. These cameras, of course, made a significant contribution to the cluttering and disruption of the courtroom. More importantly, as the Supreme Court so thoroughly documented, there are numerous situations in which televising court proceedings can cause an unfair trial—"some so subtle as to defy detection by the accused or control by the judge", such as (1) improperly influencing jurors by emphasizing the notoriety of the trial and affecting their impartial judgment,[10] distracting their attention, making it possible for an unsequestered juror to see selected portions of the testimony re-emphasized on television news programs, and improperly influencing potential jurors and thus jeopardizing the fairness of new trials; (2) impairing the testimony of witnesses, as by causing some to be frightened and others to overstate their testimony, generally influencing the testimony of witnesses, and frustrating any separation of witnesses by having any one or more of them watch a preceding witness on television even if they were admonished not to do so;

(3) distracting judges generally and exercising an adverse psychological effect, particularly upon those who are elected; and (4) imposing pressures upon the defendant and intruding into the confidential attorney-client relationship with the eye of the television camera. *Estes, supra,* 381 U.S. at 544–550, 85 S.Ct. 1628. For all of these reasons, we are forced to the conclusion that the television camera contributed significantly to the constitutional inadequacy and unfairness of this trial.

■ Where a trial is so inherently prejudicial, no showing of isolated instances of actual prejudice is required. *Estes, supra,* 381 U.S. at 542, 85 S.Ct. 1628, and *Sheppard, supra,* 384 U.S. at 352, 86 S.Ct. 1507.

Respondent has argued that this court should find that, even if there were error here, the overwhelming weight of the evidence against petitioner makes the error harmless [beyond a reasonable doubt], and thus not in violation of due process under the Fourteenth Amendment, citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). However, as is abundantly evident from the preceding portions of this opinion, we find that petitioner's trial did not comport with the "fundamental conception of a fair trial". *Estes, supra,* 381 U.S. at 560, 85 S.Ct. at 1641. There can be no doubt that that error contributed to petitioner's conviction, for the error was so significant as to control

ward G. Byrne spotlights a gaping weakness in the bail bond system that permitted a twice-convicted robber facing possible life imprisonment as an habitual criminal to roam the streets as a free man." During the time petitioner was awaiting trial, numerous articles appeared in the papers attacking the bonding system in the county and often citing petitioner as an example. It should be noted that while petitioner was on trial, one news article carried the trial judge's announcement of his candidacy for re-election, including his platform which contained a pledge that, if re-elected, he would "tighten bond requirements on repeat offenders" (Supra).

8. Additionally, as noted above, Petitioner Callahan was presented to jury in handcuffs and leg irons during the first few days of the trial, even though this shackling and unshackling could have easily been done outside of the

presence of the jury, as the trial judge later ordered. This was just one more event which emphasized to the jury the notorious nature of the petitioner.

9. *Shepard, supra,* 384 U.S. at 356, 86 S.Ct. 1507.

10. Where pre-trial publicity of all kinds has created intense public feeling which is aggravated by the telecasting or picturing of the trial the televised jurors cannot help but feel the pressures of knowing that friends and neighbors have their eyes upon them. If the community be hostile to an accused a televised juror, realizing that he must return to neighbors who saw the trial themselves, may well be led "not to hold the balance nice, clear and true between the State and the accused . . . ." *Estes, supra,* 381 U.S. at 545, 85 S.Ct. at 1634.

the proceedings, make impossible true deliberation of the case by the jury, and make the trial a nullity.[11] If we were to base our ruling on "overwhelming evidence," we would be conducting our own trial and any resulting "decision would be precisely analogous to as [sic] the decision of a trial judge if he were allowed to direct a verdict of guilty . . . [S]uch an inquiry would intrude into the province of the jury". Note, Harmless Constitutional Error: A Reappraisal, 83 Harv.L.Rev. 814, 821 (1970).

Due to the obvious fact that the state trial judge did not fulfill his duty to protect Petitioner Callahan from the inherently prejudicial publicity which saturated the community and to control the influences in the courtroom, we must order that the Writ shall be granted and petitioner discharged from custody unless the State promptly initiates procedures to provide petitioner with a retrial.

In view of the fact that petitioner has prevailed on the fair trial issue, we do not reach his contention that he was deprived of competent counsel.

---

11. The Supreme Court has noted that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman, supra,* 386 U.S. at 23, 87 S.Ct. at 827. See also Note, Harmless Constitutional Error: A Reappraisal, 83 Harv.L.Rev. 814, 823 (1970). In the instant case we are not only concerned with the type of right which was violated, but also the extreme degree of its violation.