IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 83-296

STATE OF MONTANA,

      Plaintiff and Appellant,

  v.

GREGORY LYNN JOHNSON,

      Defendant and Respondent.

FILED

DEC 21 1983

Ethel ~~ ~~rison
CLERK OF SUPREME COURT
STATE OF MONTANA

O R D E R

PER CURIAM:

      The opinion of this Court dated December 16, 1983, State of Montana v. Gregory Lynn Johnson, is hereby modified to delete the words "at trial" on page three (3), line fourteen (14) of the original opinion.

      The Clerk is directed to mail a true copy of this order to counsel of record for all parties.

      DATED this 21st day of December, 1983.

Justices

No. 83-296

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

STATE OF MONTANA,

Plaintiff and Appellant,

-vs-

GREGORY LYNN JOHNSON,

Defendant and Respondent.

APPEAL FROM: District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Joseph B. Gary, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Hon. Mike Greely, Attorney General, Helena, Montana
A. Michael Salvagni, County Attorney, Bozeman,
Montana

For Respondent:

Goetz, Madden & Dunn, Bozeman, Montana

Submitted on Briefs:  September 2, 1983

Decided:  December 16, 1983

Filed:  DEC 1 3 1983

*Ethel M. Harrison*

Clerk

Mr. Justice L.C. Gulbrandson delivered the Opinion of the Court.

This case comes on appeal from an order of the District Court of the Eighteenth Judicial District in Bozeman, Montana, granting part of defendant's motion to suppress evidence.

The alleged facts in this case indicate the following. On the morning of August 23, 1982, the victim, a Bozeman realtor, received a phone call from an individual claiming to be a Frank Bartlett. The caller requested that the victim show him a house that was listed through her real estate agency. Arrangements were made to meet at the house later that morning.

The victim arrived just before 11:00 a.m. She entered the house to make sure everything was in order before the prospective buyer arrived. When she entered the master bedroom, a man wearing a ski mask and holding a gun jumped out and grabbed her. She grabbed the barrel of the gun and pushed it away from her. A struggle ensued.

The assailant overpowered the victim and threw her to the floor. He threw the gun into a nearby closet and laid down on top of her. The assailant pulled out a hunting knife and tried to remove a strip of tape from its blade to cover the victim's eyes. She began to struggle again and grabbed at the knife, cutting her hand.

The struggling ceased and the assailant was again lying on top of the victim. The assailant then placed tape over the victim's mouth and taped her hands behind her back. He then pulled her over to a corner of the room, placed her in a sitting position and reached inside her clothing

-2-

touching her breast. The assailant then left.

The victim freed herself and reported the assault to the Gallatin County Sheriff. She gave the Sheriff's office a description of the assailant's voice and general appearance.

On September 1, 1982, approximately one week after the assault, the Sheriff's office informed the victim that they had a suspect and wanted her to come in and listen to his voice. The victim went to the Sheriff's office and was asked to stand near a door that was slightly opened. She listened for approximately five minutes as the suspect talked with Sheriff's officers. She could not see the suspect. When asked if she could identify the voice, she stated,

> "Yes, I believe I can identify that
> voice. That voice, if not the same voice
> I heard up at Story Hills on the 23rd, it
> was extremely similar. I would say it
> was the same voice."

The victim stated she talked with the assailant for approximately thirty minutes when the assault occurred. The suspect was placed under arrest following the voice identification.

On May 13, 1983, the District Court granted the defendant's motion to suppress the voice identification as evidence at trial. The District Court relied upon our decision in State v. Pendergrass (1978), 179 Mont. 106, 586 P.2d 691, in making its ruling.

The State now appeals claiming the District Court erred in granting defendant's motion to suppress the voice identification.

The reliability of procedures used in eyewitness

-3-

identification was addressed by the United States Supreme Court in a group of cases known as the Wade trilogy. United States v. Wade (1967), 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. California (1967), 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; Stovall v. Denno (1967), 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. The Wade trilogy established a per se rule that excluded all evidence of an identification obtained through unnecessarily suggestive procedures when a fairer alternative was available. Thus, the court in Stovall said:

> "The practice of showing suspects singly to persons for the purposes of identification, and not as part of a lineup, has been widely condemned. [footnote omitted]. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it . . . "

Stovall, 388 U.S. 302. In Stovall, the court found an exigent circumstance exception to the per se rule when they approved an identification made after a one-on-one confrontation because the witness was in danger of death.

Subsequent cases have not strictly applied the standards expressed in the Wade trilogy, but have adopted a more lenient totality of the circumstances approach. Under this approach, the admission of testimony concerning an unnecessarily suggestive identification procedure does not violate due process standards so long as the identification possesses sufficient aspects of reliability. Neil v. Biggers (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401. In Biggers, the court identified certain criteria to be considered in determining whether the likelihood of misidentification exists:

-4-

"We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

Biggers, 409 U.S. at 199.

The Biggers rationale was adopted by the Court in Manson v. Brathwaite (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140. In Manson, the Court examined the two post-Biggers approaches taken by lower courts regarding evidence obtained through suggestive identification procedures:

"The first, or per se approach . . . focuses on the procedures employed and requires exclusion of the out-of-court identification evidence, without regard to reliability, whether it has been obtained through unnecessarily suggested confrontation procedures. (footnote omitted)

" . . .

"The second, or more lenient, approach is one that continues to rely on the totality of the circumstances. It permits the admission of the confrontation evidence if, despite the suggestive aspect, the out-of-court identification possesses certain features of reliability."

Manson, 432 U.S. at 110.

The Manson Court rejected the per se rule stating, "[t]he per se rule . . . goes too far since its application automatically and peremptorily, and without consideration of alleviating factors, keeps evidence from the jury that is

-5-

reliable and relevant." The Manson Court added that "reliability is the linchpin" in determining admissibility for both pre- and post-Stovall confrontations. The Manson Court concluded that the factors set out in Biggers are to be applied, "and against these factors is to be weighed the corrupting effect of the suggestive identification itself." Manson, 432 U.S. at 114.

In State v. Pendergrass (1978), 179 Mont. 106, 586 P.2d 691, we applied the Biggers-Manson test to a voice identification procedure. In Pendergrass, the defendant was accused of committing a rape at a Helena grocery store. Thirty-two hours after the incident occurred, the victim of the assault was asked to come to the police station. She was told that a suspect in the crime was going to be questioned, and was given an opportunity to listen to the conversation. The defendant and an officer were on one side of a room divided, floor-to-ceiling, by filing cabinets with the victim stationed on the other side. The officer interrogated the suspect as to his activities on the night in question. The suspect was not asked to repeat any phrases the victim had said her assailant used. When the victim was asked her opinion of the defendant's voice, she replied either "I think that is the voice" or "I believe that is the voice." We concluded that the totality of the circumstances surrounding the voice identification gave rise to a very substantial likelihood of irreparable misidentification and due process required exclusion of the evidence. In reaching that conclusion, we used a step-by-step application of the Biggers-Manson criteria.

By applying the five-step Biggers-Manson test, as

-6-

adopted in _Pendergrass_, to the facts of this case, we conclude that the District Court erred in its decision.

Specifically, the five factors provide:

(1) Opportunity of the witness to view the criminal at the time of the crime. Here, as in _Pendergrass_, the victim did not see the assailant's face. However, in _Pendergrass_ the victim made conscious effort not to see her assailant while the victim, in the present case, gave a detailed description of his overall appearance. In particular, the victim viewed her assailant for approximately twenty minutes before her eyes were taped and described him as male, approximately 5'6" in height, wearing brown scratched shoes, blue jeans, blue hooded sweatshirt, dark curly hair, hazel eyes with long eyelashes, strong garlic smell on his breath, a heavy smell of aftershave and a soft, hesitating voice. These facts indicate the first step of the _Pendergrass_ test was satisfied.

(2) The witness' degree of attention. Clearly the victim was paying close attention to the assailant to describe him as she did. Indeed, the assailant laid on top of the victim for approximately thirty minutes after they had scuffled over the gun and knife. In addition, at the suppression hearing, the victim testified she was paying close attention to the voice. Thus, the second step of the _Pendergrass_ test was satisfied.

(3) The accuracy of the prior description. The previous discussion indicates the witness gave a detailed description of her assailant. The description was much more full and complete than the description given by the victim in _Pendergrass_ and the District Court properly determined

that the third step was satisfied.

(4) The witness' level of certainty at the confrontation. As previously noted, when the victim in this case was asked if she could identify the voice of the defendant at the initial confrontation she stated:

> "Yes, I believe I can identify that voice. That voice, if not the same voice I heard up at Story Hills on the 23rd, it was extremely similar. I would say it was the same voice." (emphasis added)

At the suppression hearing, the victim gave the following testimony on direct examination:

> "Q. And could you identify this voice?
>
> "A. At the time I thought it was identical to the voice I heard in the house.
>
> "Q. And this was approximately one week after?
>
> "A. One week after.
>
> "Q. You've testified that you conversed with the assailant for approximately a half hour, is that correct?
>
> "A. Yes, I talked constantly the whole time, and he talked back to me. He never told me to shut up.
>
> "Q. And how close to this individual were you during these conversation?
>
> "A. If it wasn't face to face, he was, it was always a very close proximity.
>
> "Q. And during these conversations, were you paying attention to this voice?
>
> "A. Yes
>
> "Q. Were there any distractions?
>
> "A. No, well just the gun and the knife.
>
> "Q. But other than that--
>
> "A. No, no distraction. It was absolutely silent except for the two people talking, the two of us."

-8-

Upon cross examination the victim stated:

"Q. Well, you are completely sure that that was the voice you heard.

"A. At that time I was."

The victim also said the following on cross examination:

"Q. And you were not at that time, that is during the assault, focusing on a voice. You were concerned about protecting yourself and your welfare and getting rid of the person.

"A. That's true, but it got to the point where when he was laying on top of me for it seemed like an eternity, we talked during that time, and his voice was like right here and we-- I at that point, I think I'm an astute observer. I listened and we conversed; and at that point there were less distractions other than the entire incident.

"Q. But you were not focusing at that time or any other time on his voice specifically?

"A. I was focusing on getting out of there alive."

The District Court held that the victim made the type of equivocal voice identification that we held was inadmissible on due process grounds in Pendergrass. In Pendergrass, we said:

"Rather than making an unequivocal statement at the time she made the identification, the response of the witness here was a qualified 'I think that's the voice' or 'That sounds like the voice.'"

Pendergrass, 179 Mont. at 117.

However, the statement of the victim in Pendergrass was more equivocal than the statement of the victim in this case. Rather than say "I think" or "I believe that's the voice," here the victim said she could identify the voice and added "I would say it was the same voice." This was an unequivocal voice identification that should not have been

-9-

suppressed by the District Court. Moreover, the fact that the assailant was lying on top of the victim for approximately twenty minutes as he was speaking, makes the victim's voice identification even more reliable than the identification in Pendergrass. Thus, the fourth step of the Biggers-Manson test was satisfied and the voice identification should not have been suppressed because of the victim's uncertainty.

(5) The time between the crime and the confrontation. In Pendergrass, thirty two hours elapsed between the crime and the confrontation. In the present case, approximately one week elapsed between the assault and the confrontation. We agree with the District Court that seven days between the assault and the confrontration should not render the identification inadmissible. Indeed, in State v. Dahl (Mont. 1980), 620 P.2d 361, 37 St.Rep 1852, we held that an eight-day delay between the time of the crime and the confrontation was permissible.

In short, the application of the Biggers-Manson criteria as adopted in Pendergrass, to the facts of this case, indicate sufficient indicia of reliability to allow the voice identification into evidence. However, our decision does not stand for the proposition that the identification procedure used by the police in this case was ideal. Clearly a "voice line-up," in which the victim must make an identification after listening to several voices, is the most reliable procedure. Nevertheless, our analysis of the totality of the circumstances in this case convince us that the victim's voice identification was sufficient, and the District Court erred in its ruling.

-10-

We therefore reverse and remand in accordance with our decision.

_____
Justice

We concur:

_____

_____

_____
Justices

Mr. Justice Daniel J. Shea, dissenting:

I dissent.  The one-person voice line-up was unduly suggestive and I would hold the voice identification to be inadmissible.

_____
Justice