FILED

08/23/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0676

DA 14-0676

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 207

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

TOBY EUGENE GRIEGO,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 13-0726
Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad M. Wright, Chief Appellate Defender, Koan Mercer, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

            Scott D. Twito, Yellowstone County Attorney, Juli M. Pierce, Chief
Deputy County Attorney, Billings, Montana

Submitted on Briefs:  June 8, 2016

Decided:  August 23, 2016

Filed:

                                   Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 Toby Eugene Griego appeals his conviction of ten counts of sexual intercourse without consent, six counts of robbery, four counts of aggravated kidnapping, two counts of intimidation, two counts of aggravated assault, one count of assault with a weapon, one count of attempted sexual intercourse without consent, and one count of misdemeanor surreptitious visual observation or recordation in a residence following a jury trial in the Thirteenth Judicial District Court, Yellowstone County. We affirm.

## ISSUES

¶2 We restate and review the following issues:

*1. Did the District Court err by denying Griego's motion for change of venue?*

*2. Did the District Court err by denying Griego's motion to suppress voice identification evidence?*

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Assaults

¶3 Between the months of January 2013 and July 2013 a series of home-invasion sexual assaults and robberies occurred in the Billings, Montana, area. The first reported assault occurred in the early morning of January 27, 2013, when twenty-one-year-old victim K.L., asleep in her bed, was awakened by a gloved hand cupped over her mouth, a knife held to her throat, and a man telling her to be quiet. K.L. was blindfolded, gagged, her feet and hands tied together, and she was forced to endure hours of physical trauma. The attacker first punched K.L. in the back of the head, and then used multiple objects, including a vibrator and a toilet plunger, to penetrate her vaginally and anally. After the

2

initial sexual assault, she was ordered to bathe, and after she was finished bathing to his satisfaction her attacker dragged her by her hair back onto her bed and penetrated her both vaginally and anally again, first with the vibrator and then with his penis. When K.L. tried to escape her attacker struck her again in the head. She was forced to bathe a second time, during which her attacker submerged her head in the bathtub. For a second time K.L.'s attacker dragged her from the bathtub by her hair and continued the assault by penetrating her anally with the toilet plunger and forcing her to masturbate with the vibrator. Then her attacker finally left, taking with him K.L.'s purse, jewelry, phone, and a bag of money she used to make change at her job as a server in a restaurant. When K.L. realized that her phone was missing she ran to a neighbor's house to call 911.

¶4      In the early morning of April 25, 2013, a second victim, twenty-three-year-old P.C. who was asleep in her bed, was awakened by a man rummaging through her belongings. The man grabbed P.C., put his hand over her mouth, began to choke her around her neck, and told her not to look at him. P.C.'s attacker next gagged her, tied her hands behind her back, turned her onto her stomach, and tried to remove her underwear. When P.C. began struggling to get away her attacker responded by digging his hands into her eye sockets, which caused her to stop struggling. Her attacker then removed her underwear and touched her vaginal area with his hands. P.C. struggled a second time, and this time was able to get herself off of the bed, and spit the gag from her mouth. She crawled to her bedroom door, and screamed at the top of her lungs. When P.C.'s attacker could not regain control of her he punched her in the face and fled from the home taking P.C.'s phone with him. When she could not find her phone she forced her way through

3

her roommate's locked bedroom door and yelled to her roommate that a man had tried to rape her and to call 911. The two women barricaded her roommate's door and called 911.

¶5 In the early morning of May 27, 2013, a third victim, twenty-year-old T.C. who was asleep in her bed, was awakened by the sensation of being shocked by a stun gun weapon, and then noticed a hand covering her mouth. The man told her to be quiet and not to look at him. When T.C. tried to look at her attacker he struck her in the back of the head. Next T.C.'s attacker tied her hands behind her back and her legs together, and gagged her. As she was bound and lying on her stomach, she heard her attacker walking through her apartment and rummaging through her belongings. The attacker next blindfolded T.C. and tied a belt from her closet around her neck. He also found the handgun T.C. kept in her bedside table and told T.C. that if she did not cooperate he would shoot her. He then tightened the belt around T.C.'s neck and choked her to the point that she began to lose consciousness.

¶6 T.C.'s attacker next went into T.C.'s kitchen and retrieved bottles of red wine, vodka, and rum, which he forced T.C. to consume. He instructed T.C. to drink quickly. He told her if he determined she was not drinking quickly enough he would count down from ten and if he reached one he would strangle her again. T.C. was forced to drink one full bottle of red wine, one quarter bottle of vodka, and one quarter bottle of rum in minutes. T.C.'s attacker used the stun gun weapon repeatedly on various parts of her body, including on her genitals, and forced T.C. to masturbate with her electric

4

toothbrush. He then penetrated T.C. both vaginally and anally with a foreign object, while at the same time T.C. was vomiting due to the amount of alcohol she consumed.

¶7    At some point T.C. offered to give her attacker money to make him stop the assault. He untied T.C., dressed her, took her to her car, and drove her to a bank so that T.C. could withdraw money from an ATM. Once they reached the bank T.C. decided to attempt to escape. She began running but was tackled from behind. T.C. was unable to successfully withdraw any money, so her attacker returned to T.C.'s home to continue the assault. T.C.'s attacker used a foreign object, possibly a curling iron, to penetrate T.C. vaginally and anally, and again used the stun gun weapon on T.C.'s genitals. He then forced T.C. to shower and took her back to her bed. Finally, he told her he knew her hometown and threatened to kill her friends and family if she told anyone what happened. He left T.C.'s home taking her handgun and phone with him. When T.C. could not find her phone, still very intoxicated, she attempted to drive to the police department, and when she could not find it she stopped at the Crowne Plaza Hotel and told the night attendant to call 911.

¶8    In the early morning of July 2, 2013, a fourth victim, thirty-year-old J.N. who was asleep in her bed, was awakened by a man's voice and the feeling of hands over her face and mouth. The man told J.N. to be quiet, and if she cooperated she would not be hurt. He also told J.N. that he had a partner in her home and that they would be going through the house to look for money and other things. He told her to roll onto her stomach, not to look at him, and to keep her face down. He pressed the back of her head into the pillow and pulled back her comforter to look at her nude body. J.N. heard the man rummage

5

through the drawers and closet in her room. He took items he found to blindfold and gag J.N., and tie her hands behind her back. He told her he had found her roommate's handgun and he would shoot her if she failed to cooperate. He asked her questions about who lived with her and where they were that night. She told him that her roommates were out of town, and the attacker left her room to confirm they were alone.

¶9 When J.N.'s attacker returned he positioned her onto her knees and began sexually assaulting her. He used a foreign object to penetrate her vaginally, anally, and orally. He put the object into her hands and forced her to masturbate with it. He made various comments to her throughout the assault, including ordering her to move into different positions, and telling her information about her boyfriend that led her to believe that he had seen them before. He asked her if she had money in the house, and because she did not J.N. told him she would take him to an ATM because she hoped it would make the assault stop. J.N.'s attacker then dressed her with clothes he found in her room and instructed her to get into her car and he took her to an ATM. At the ATM he removed her blindfold and told her not to look at him, and to go withdraw cash; she withdrew $200. Afterward, he instructed J.N. to lay down in the backseat of the car and to keep quiet. They returned to her house and J.N.'s attacker resumed the assaults, penetrating her vaginally with a foreign object, but at one point telling her "I'm getting bored."

¶10 Then J.N.'s attacker removed her blindfold, bindings, and gag and placed duct tape over her eyes and mouth and walked her to a ditch near her house. He forced J.N. to lie on her stomach in the ditch and began shoving her head repeatedly into the water, each time to the point where J.N. nearly passed out. Afterward, J.N.'s attacker took her

back to her house to resume his assaults for a third time. First, he ordered J.N. to shower, then he re-bound her hands and feet, pressed a knife against her collarbone, and used some sort of rubber object to hit her several times on the stomach and on her buttocks. He again penetrated her with a foreign object several times vaginally, anally, and orally, forcefully choking her with the object, and then used her comforter to smother her until near unconsciousness. He then wiped her whole body with some type of sanitizing wipe, untied her, forced her to shower with soap, used her toothbrush to brush an acidic, metallic substance into her mouth, and swabbed her genital area with the same substance. J.N.'s attacker told her to stay in the shower with her eyes closed, and he left her house taking her purse and her phone with him. J.N. remained in the shower until she was certain her attacker was gone and then drove to a coffee shop where she called 911. Based on the time J.N. went to bed, the timestamp of her ATM transaction, and the time she called 911 the total attack occurred over a period of about five hours.

¶11 During each assault all four women reported that they believed they were being photographed and many heard the sound of a clicking noise as though it came from a camera or a camera phone.

**B. News Media Coverage, Police Investigation, and Griego's Arrest**

¶12 After the third assault, the assault of T.C., the local *Billings Gazette* newspaper began running news articles about the home-invasion sexual assaults, which were also picked up by other news outlets. There were two articles reported in May 2013, eight articles reported in July 2013, and one article reported in August 2013 prior to Griego's arrest. The subjects of these articles alerted the Billings population of the known

7

physical characteristics of the perpetrator (five-foot, five-inch white male, twenty-five to thirty-five years old, thin build with light-colored hair), as well as provided general safety tips (lock windows and doors, tell friends of whereabouts, do not take drinks or rides from strangers, etc.) and informed residents of available self-defense classes. After the news outlets ran these articles the Billings Police Department (BPD) began receiving phone calls of tips and leads to its CrimeStoppers hotline.

¶13 On July 15, 2013, a woman reported to the BPD hotline that a man had followed her in the Hobby Lobby store, which had made her very uncomfortable. As a result, a BPD detective followed up on the woman's complaint and learned from a Hobby Lobby store manager that a man had been frequenting the store for several years who rarely purchased anything, but appeared to follow women around the store with his cellphone out. In fact, about five years prior to the 2013 assaults the Hobby Lobby manager had alerted employees to inform her if this man came into the store. The store manager was able to identify the man from store surveillance videos, and the BPD later identified him as Griego.

¶14 Once the BPD identified Griego, detectives discovered Griego had worked at Mattress Land in Billings and had delivered mattresses to T.C.'s home, and to a home located near P.C.'s home just prior to their respective attacks. Officers began to surveil Griego and observed him surreptitiously watching women. The BPD discovered Griego had a criminal record in New Mexico that included a previous conviction for the abduction and sexual assault of a sixteen-year-old female. The BPD obtained a voice recording of Griego that was created during an investigation of an unrelated incident in

2010. The recording clearly indicated the speaker was accused of criminal activity and included Griego making the following statements: "because I am not going to be railroaded into anything"; "I told you that I didn't know what you were talking about, and I didn't do anything"; "you told me what I was being accused of and I told you I didn't do it"; and "I'll tell you right now that you explained all that, I didn't do that either."

¶15 On August 8, 2013, the BPD asked J.N. to listen to Griego's voice sample to see if she could identify the voice on the recording. She was given preprinted instructions that stated it was equally important to rule out a voice as it was to identify a voice. Upon hearing the voice sample J.N. experienced an extreme physical reaction that caused her to shake and her heart to race. She stated she was absolutely "110%" certain the voice belonged to her attacker. However, J.N. only listened to the single voice sample. She was not given any other samples for the sake of comparison.

¶16 On August 22, 2013, the BPD conducted a search of Griego's home. As a result of the search detectives discovered photographs on Griego's phone of J.N., taken from outside of her home, T.C., including one that showed her in the shower, crying, with blood streaming down her face, and multiple other unidentified females, taken through windows. The BPD was later able to identify P.C.'s body parts in some of the photographs. Detectives also discovered videos on Griego's phone of the sexual assaults of K.L. and T.C. During the video of the sexual assault of T.C. Griego's face is visible on two occasions.

¶17 After Griego's arrest various news outlets reported the story as a top news story. The news media reported some of the details of the assaults found in Griego's charging

documents, as well as details of his previous conviction for the abduction and sexual assault of a sixteen-year-old female in New Mexico. Some members of the Billings community expressed shock, outrage, and disgust on the online public comment sections of the news stories.

### C. Procedural History

¶18 On September 5, 2013, the State charged Griego by information of thirty-eight counts (eventually amended to forty), twenty-seven of which were tried together and apply to this appeal. Applicable here, Griego was charged with ten counts of felony sexual intercourse without consent, in violation of § 45-5-503, MCA; six counts of felony robbery, in violation of § 45-5-401(1)(b), MCA; four counts of felony aggravated kidnapping, in violation of § 45-5-303(1)(b), MCA; two counts of felony intimidation, in violation of § 45-5-203(1)(a), MCA; two counts of felony aggravated assault, in violation of § 45-5-202, MCA; one count of felony assault with a weapon, in violation of § 45-5-213(1)(b), MCA; one count of felony attempted sexual intercourse without consent, in violation of §§ 45-5-503 and 45-4-103, MCA; and one count of misdemeanor surreptitious visual observation or recordation in a residence, in violation of § 45-5-223(1)(b), MCA. On December 16, 2013, Griego filed a motion to change venue based on the amount of pretrial publicity surrounding the investigation, Griego's background and previous crimes, and his arrest. On December 18, 2013, Griego filed a motion to suppress evidence, which included the request to suppress J.N.'s voice identification of Griego. The District Court conduced a hearing related to both motions

on January 16, 2014. At the hearing the State presented documentary evidence and testimonial evidence from J.N. and a BDP detective.

¶19 On January 27, 2014 the District Court issued its order denying both motions to change venue and to suppress the evidence of J.N.'s voice identification. In its order the District Court found that Griego was unable to show presumed prejudice that would make an unbiased jury pool unavailable, and that voir dire was "the best way to sift through any bias that may exist" to determine actual prejudice. In regard to the motion to suppress, the District Court found, based on the totality of the circumstances, there were "sufficient indicia of reliability to admit the voice identification into evidence."

¶20 Beginning on April 2, 2014, the District Court presided over a nine-day jury trial. For the first three days counsel conducted voir dire of the potential jurors. On April 14, 2014, Griego was found guilty of all twenty-seven charges. He was sentenced on July 25, 2014.

## STANDARDS OF REVIEW

¶21 We review a district court's ruling on a motion for a change of venue for an abuse of discretion. However, when exercising its discretion, a district court must uphold the criminal defendant's constitutional right to a trial by an impartial jury. *State v. Kingman*, 2011 MT 269, ¶ 40, 362 Mont. 330, 264 P.3d 1104.

¶22 We review a district court's denial of a motion to suppress evidence to determine whether its findings of fact are clearly erroneous and whether its conclusions of law are correct. *State v. Van Kirk*, 2001 MT 184, ¶ 10, 306 Mont. 215, 32 P.3d 735. The review of whether a criminal defendant's constitutional due process right was violated is a

question of constitutional law, of which our review is plenary. *State v. Lally*, 2008 MT 452, ¶ 13, 348 Mont. 59, 199 P.3d 818.

## DISCUSSION

¶23    *1. Did the District Court err by denying Griego's motion for change of venue?*

¶24    A criminal defendant is guaranteed the constitutional right to a fair trial by an impartial jury. Mont. Const. art. II, §§ 17, 24. If it is determined that a fair trial cannot be held in a county then a district court must either transfer the case to another county, select a jury from another county, or take some other action that will ensure a fair trial will occur. *Kingman*, ¶ 18 (citing § 46-13-203, MCA). Underlying the implication of unfairness is the presumption that the criminal defendant has been prejudged by an outside influence to such an extent that jurors from a community will be unable to remain objective during the trial and evaluate the evidence impartially. *Kingman*, ¶¶ 19-20.

¶25    A defendant can establish prejudice by one of two ways: 1) by demonstrating the jury pool is *actually* prejudiced against him, or 2) by demonstrating there is *presumed* prejudice in the community where the jury pool is taken due to pretrial publicity. *Kingman*, ¶ 20. Actual prejudice is established through the voir dire process to show that the potential jurors harbor "actual partiality or hostility against the defendant that cannot be laid aside." *Kingman*, ¶ 32. For presumed prejudice to occur the pretrial publicity must be "so pervasive and prejudicial that [a court] cannot expect to find an unbiased jury pool in the community." *Kingman*, ¶ 21 (quoting *Goss v. Nelson*, 439 F.3d 621, 628 (10th Cir. 2006)). The publicity must be both "extensive *and* sensational in nature." *Kingman*, ¶ 21 (emphasis in original). The bar for presumed prejudice is extremely high

12

and the defendant must demonstrate "a circus atmosphere or lynch mob mentality." *Kingman*, ¶ 32. S*ee, e.g.*, *State ex rel. Coburn v. Bennett*, 202 Mont. 20, 655 P.2d 502 (1982); *State v. Dryman*, 127 Mont. 579, 269 P.2d 796 (1954); *State v. Spotted Hawk*, 22 Mont. 33, 55 P. 1026 (1899); *Rideau v. La.*, 373 U.S. 723, 83 S. Ct. 1417 (1963); and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507 (1966).

¶26 In arguing that the pretrial publicity caused presumed prejudice a defendant must demonstrate that the news reports were inflammatory *and* that the reports actually inflamed the prejudice of the community so that a reasonable possibility exists that the defendant may not receive a fair trial. *State v. Hill*, 2000 MT 308, ¶ 51, 302 Mont. 415, 14 P.3d 1237. Inflammatory publicity is:

> publicity which, by its nature, has the tendency to stir up in the community pervasive and strong passions of anger, hatred, indignation, revulsion, and upset such that there are reasonable grounds to believe that juror chosen from this community could not determine the defendant's guilt or innocence in a fair and unbiased manner and based solely upon the evidence admitted at trial.

*State v. Devlin*, 2009 MT 18, ¶ 24, 349 Mont. 67, 201 P.3d 791. While the determination of whether publicity is inflammatory is fact-specific to each case, factors to consider are: the size of the jury pool, the nature of the offense charged, the type and content of the media reports, the readership of the publication, the relative size of the audience, the time lapse between the publicity and the trial, whether the reports appear to take a position on the defendant's guilt, whether the reports contain extrajudicial statements by prosecutors or law enforcement that are prejudicial to the defendant, and whether there is any apparent adverse community reaction to the publicity. *Devlin*, ¶ 24.

13

¶27 Griego argues his constitutional right to a fair trial by an impartial jury was violated because the publicity surrounding the crimes and his arrest dictates a finding of presumed prejudice. He argues the nature of the publicity was inflammatory, the community was in fact inflamed, and his conviction on all counts presumes prejudice. He cites primarily to two cases, *Coburn* and *Dryman*, where prejudice was found to support his arguments.

¶28 In *Coburn*, where we found that inherent prejudice existed warranting a change of venue, the defendant was accused of the kidnapping and sexual assault of an eleven-year-old girl. *Coburn*, 202 Mont. at 22, 34, 655 P.2d at 503, 509. Upon arrest, Coburn's bail was set at $100,000 and then later reduced to $15,000. His arrest made front-page news of the Helena *Independent Record* newspaper, and included the information about the reduction in bail along with a quote from the sheriff criticizing the District Court Judge's decision to reduce Coburn's bail. *Coburn*, 202 Mont. at 22-23, 655 P.2d at 503. A second news article included statements made by county attorneys of their opinions about the victim, her credibility, and Coburn's guilt. *Coburn*, 202 Mont. at 23-24, 655 P.2d at 503-04.

¶29 Incidents continued to occur throughout the pendency of Coburn's case. A group of more than 300 demonstrators gathered on the courthouse lawn in protest of the judge's decision to reduce Coburn's bail. *Coburn*, 202 Mont. at 24, 655 P.2d at 504. A billboard was put up in the community stating that the presiding judge's decision was wrong. *Coburn*, 202 Mont. at 25, 655 P.2d at 504. Community forums were held about sex offenders, where the County Attorney spoke at on at least one occasion, and a committee

14

was formed to find a write-in candidate to oppose the presiding judge in the upcoming primary election. *Coburn*, 202 Mont. at 26-27, 655 P.2d at 505. Sixty Helena stop signs were vandalized with stencils and white paint to read "STOP RAPE." *Coburn*, 202 Mont. at 27, 655 P.2d at 505. The County Attorney, who was up for reelection, used the case as a platform, championing high bail amounts for serious crimes. *Coburn*, 202 Mont. at 28-29, 655 P.2d at 506. Coburn received death threats, and pending trial, he and his wife were forced to move from their home out of fear of retaliation. *Coburn*, 202 Mont. at 27-28, 655 P.2d at 506. All of above the incidents were reported in the *Independent Record*. *Coburn*, 202 Mont. at 22-28, 655 P.2d at 503-06.

¶30 In *Dryman*, where we likewise found that a change of venue was necessary, the nineteen-year-old defendant was accused of murder in rural Toole County. *Dryman*, 127 Mont. at 580, 590, 269 P.2d at 796, 801. Initially Dryman, without counsel, entered a guilty plea. The trial court conducted an evidentiary hearing to determine the degree of murder to charge Dryman and then sentenced him to death. *Dryman*, 127 Mont. at 580, 269 P.2d at 796. The hearing was well-attended by the community, with the courtroom at capacity and standing room only. *Dryman*, 127 Mont. at 582, 269 P.2d at 797. After hiring counsel Dryman attempted to change his plea, which was denied by the trial court but remanded on appeal with directions to enter a plea of not guilty and to conduct a trial. *Dryman*, 127 Mont. at 580-581, 269 P.2d at 796.

¶31 Subsequent to Dryman's initial hearing and sentencing, local newspaper reports published a photo of the defendant with the word "killer" written across, and in news stories referred to Dryman as a "cold blooded killer," described his deeds as "dastardly,"

15

reported that complete evidence of his guilt had been obtained, and stated that Dryman was "so steeped in criminal tendencies that nothing could appeal to his warped and stony mind." *Dryman*, 127 Mont. at 582-583, 269 P.2d at 797. Further, the local sheriff requested for Dryman to be moved to the state prison pending trial for his own safety because the community sentiment was so fervent, to which the prison commission, which included the governor, secretary of state, and attorney general, agreed. *Dryman*, 127 Mont. at 583-84, 588, 269 P.2d at 798, 800. Witnesses testified that they believed Dryman was guilty because he had confessed. *Dryman*, 127 Mont. at 586, 269 P.2d at 799.

¶32 Both *Coburn* and *Dryman* demonstrate instances where the community as a whole was actively embroiled in prejudicial sentiment about the defendants, the news outlets reported on the sentiment, and further, the news outlets reported biased, provocative commentary. They are inapposite to the instant case. Here, in regard to whether the nature of the publicity substantiates a showing of presumed prejudice, the news media did report on the assaults, the investigation, safety tips, and Griego's past, his current arrest and subsequent trial, but did so in a manner that was objective and factual. Further, the articles that contain extrajudicial statements made by prosecutors or law enforcement are factual reports, and law enforcement are also quoted as refusing to release more detailed information in order to protect the investigation. Moreover, we have stated that news reports that contain the factual accounts of the background of the case as well as the trial proceedings are not inflammatory. *Devlin*, ¶ 21.

16

¶33    Prior to Griego's arrest when the crimes were still occurring and the perpetrator was unknown, the news media reported on general safety tips and the availability of community resources for those who felt unsafe and fearful, because there was a legitimate community concern. Griego argues that this perpetuated the fear; however, it could just as equally be viewed as providing information to calm any fear. Regardless, the safety information was provided when the perpetrator was unknown and ceased once a suspect was apprehended. While the dissemination of the types of facts involved in the instant case, and Griego's previous conviction of sexual assault in New Mexico, should be considered in the analysis of whether the nature of the publicity was inflammatory they account for one of the factors, which is not alone conclusive.

¶34    Griego argues that there was a public sentiment that presumed prejudice, as shown by comments made on the online versions of the *Billings Gazette* articles and the links to the articles on its Facebook page. He further argues that the conviction on all counts is itself proof of presumed prejudice. Again, these are factors to consider and not themselves conclusive. However, we disagree with Griego's contention that public comment on news articles shows community-wide prejudice. A smattering of online comments found on news stories hardly substantiates a finding of community prejudice in a large community such as Billings. We agree with the District Court that the best method to uncover this type of potential prejudice is through the voir dire process. In regard to Griego's conviction on all counts, alone it does not substantiate a finding of presumed prejudice, and it needs no further discussion.

17

¶35     Griego has failed to show anything "beyond [a] bare allegation . . . to prove that the community [was] actually infected with prejudice." *Devlin*, ¶ 30 (quoting *State v. Link*, 194 Mont. 556, 560, 640 P.2d 366, 368 (1981)).  He was given the opportunity to ferret out any actual prejudice caused by the alleged inflammatory pretrial publicity through the voir dire process to show he would not receive a fair trial by an impartial jury. The District Court was cognizant of potential impartiality issues and conducted three days of voir dire.   All potential jurors were required to submit two juror questionnaires: one relating to their personal background, and a second relating to issues particular to the case.   The parties voir dired potential jurors individually until they collected a pool of 80 potential jurors.  Then, the parties conducted a general voir dire of the potential jurors to select twelve jurors and three alternate jurors.  Griego passed the jury for cause and did not renew his motion to change venue.  We hold that the District Court did not abuse its discretion by denying Griego's motion to change venue.

¶36     *2. Did the District Court err by denying Griego's motion to suppress voice identification evidence?*

¶37     At the outset we echo Justice Brennan's sentiment that "[t]he vagaries of [witness] identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *U.S. v. Wade*, 388 U.S. 218, 228, 87 S. Ct. 1926, 1933 (1967).

> A major factor contributing to the high incidence[s] of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. . . . "[I]mproper suggestion . . . probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined."

18

*Wade*, 388 U.S. at 228-29, 87 S. Ct. at 1933 (citation omitted). Justice should be leery of suggestive identification procedures.

¶38 A criminal defendant has the constitutional right to be free from the admission of evidence that is derived from suggestive identification procedures "where there is a substantial likelihood of irreparable misidentification," thus violating the defendant's due process right. *Lally*, ¶ 14 (citations omitted). We have historically viewed law enforcement's voice identification techniques similarly to visual identification techniques. In *State v. Johnson*, 207 Mont. 214, 674 P.2d 1077 (1983) we clarified that we review the totality of the circumstances to determine if a voice identification procedure was impermissibly suggestive. *Johnson*, 207 Mont. at 217-222, 674 P.2d at 1079-1081. Under the totality of the circumstances test we first determine whether the pretrial identification procedure was impermissibly suggestive. If we deem it so, then we review the totality of the circumstances to determine whether the suggestive procedure created a substantial likelihood of irreparable misidentification. *Lally*, ¶ 15.

¶39 Griego argues his constitutional right of due process was violated when J.N.'s voice identification evidence was admitted at trial. He argues that he was unduly prejudiced by the method of voice identification, and further that J.N.'s identification does not satisfy the totality of the circumstances test.

¶40 "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a line up, [is] widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972 (1967). The stage in the process at which a suspect identification occurs is a critical and irreversible moment for the defendant. Once

19

identification occurs a witness is highly unlikely to go back on his word, so for all practical purposes identity is determined at that pretrial moment of identification. *Wade*, 388 U.S. at 229, 87 S. Ct. at 1933.

¶41 Here, the witness, J.N., was also a victim of the defendant's crimes and was no doubt motivated to help find the perpetrator of those crimes. She was given one single voice exemplar to review and was not given the benefit of comparison. While the officer conducting the voice identification gave the witness preprinted information directing her that it was as equally important to rule out a suspect as it was to identify one, the exemplar was of Griego's voice disputing accusatory statements while involved in police questioning. Furthermore, the investigating officer himself testified it would have been better to use a voice line-up procedure, and our review of the record fails to show any exigent circumstances to warrant the use of a single-person identification technique. Based on these facts, we conclude that the method of witness identification used in this case was impermissibly suggestive. Next, we turn to whether the impermissibly suggestive witness identification technique in this case violated the defendant's right of due process when viewed under the totality of the circumstances.

¶42 To determine the totality of the circumstances surrounding the witness identification we review the following factors: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the prior description; 4) the witness's level of certainty at the confrontation; and 5) the time between the crime and the confrontation. *Johnson*, 207 Mont. at 219-22, 674 P.2d at 1080-81.

¶43 Here, as in *Johnson*, J.N. was unable to adequately view her attacker. However, she was able to provide a general description that he was approximately her height, of average build, and with a shaved head or no hair. She was able to describe the color of the pants and shirt he was wearing, and provide a description to the best of her abilities under the circumstances. Similar to *Johnson*, we find that these facts indicate the first factor of the test is satisfied.

¶44 Second, she stated that she tried to pay close attention to the details of a horrific assault. She tried to look at her attacker's body type and appearance, and listen to the sound of his voice, including his accent and cadence, because she was blindfolded through most of his assaults. Further, he spoke conversationally to her, and instructed her to do certain things, all throughout the total amount of time of the assaults, which amounted to around five hours. J.N. told detectives and also testified that she would be able to identify her attacker's voice if she ever heard it again. We find that these facts satisfy the second factor of the test.

¶45 Third, the general physical description she provided of her attacker describes Griego. J.N.'s description of her attacker's accent likewise describes Griego's accent. We find that the third factor of the test is satisfied. Fourth, at confrontation J.N. stated that she was "110%" positive that the voice she heard on the exemplar was the voice of her attacker. She also experienced a notable negative physical reaction to the sound of the voice exemplar. We find the fourth factor of the test satisfied. Fifth, thirty-eight days passed between J.N.'s attack and the confrontation. While this is a notable length of time, she spent a significant amount of time, nearly five hours, with her attacker and was

21

forced to endure unforgettable trauma. In this case we will not find this lapse of time to render the identification inadmissible.

¶46 The facts of this case indicate sufficient indicia of reliability to allow J.N.'s voice identification into evidence. *Johnson*, 207 Mont. at 222, 674 P.2d at 1081. We conclude that the District Court's findings of fact are not clearly erroneous. Further, based on the totality of the circumstances, we hold that the suggestive witness identification procedure used in this case did not violate Griego's constitutional right to due process. We note that the total evidence in this case overwhelmingly proved that Griego was the perpetrator of his convicted crimes, but it is not a stretch to imagine a circumstance with less incriminating total evidence where such a suspect identification technique would cause otherwise valid witness identification evidence to be suppressed. Therefore, we reiterate, absent exigent circumstances, a single-person witness identification procedure is inherently unreliable and we implore law enforcement to refrain from using this technique.

## CONCLUSION

¶47 For the foregoing reasons, we conclude that the District Court did not err by denying Griego's motion for change of venue or his motion for suppression of evidence. The District Court's order denying these motions is affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JIM RICE