FILED

02/08/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0214

DA 15-0214

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 24

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

MARKUS HENDRIK KAARMA,

      Defendant and Appellant.

APPEAL FROM:     District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-2014-252
Honorable Ed McLean, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Nathaniel S. Holloway, Paul T. Ryan, Paul Ryan & Associates,
Missoula, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

          Kirsten H. Pabst, Missoula County Attorney, Andrew Paul, Jennifer Clark,
Karla Painter, Deputy County Attorneys, Missoula, Montana

Submitted on Briefs:  October 19, 2016

Decided:  February 8, 2017

Filed:

                                     Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    Markus Hendrik Kaarma (Kaarma) appeals from his December 17, 2014 deliberate homicide conviction by a jury. We affirm.

¶2    We restate the issues on appeal as follows:

*Issue One:  Did the District Court abuse its discretion by instructing the jury on justifiable use of force in defense of a person?*

*Issue Two: Did the District Court abuse its discretion when it denied Kaarma's motions to change venue based on pretrial publicity?*

*Issue Three:  Did the District Court abuse its discretion when it declined to remove a prospective juror for cause based on her marriage to a former police officer?*

*Issue Four: Did the District Court abuse its discretion when it admitted evidence of Kaarma's prior assault on Pflager?*

*Issue Five: Did the District Court abuse its discretion when it allowed lay opinion testimony regarding blood spatter evidence?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    In April 2014, the Missoula, Montana, home Kaarma and his partner Janelle Pflager (Pflager) shared with their infant son was burglarized two times. Each time the burglar entered the garage through the partially open garage door. Concerned about safety, Kaarma and Pflager installed security cameras in and around their garage, changed how they parked their cars, started locking the doors to the house, created a perimeter to discourage entrance into the garage, encouraged their neighbors to do the same, and placed a purse with identifying information in the garage. Kaarma was vocal about his anger regarding the burglaries and his perception that the police were not

2

"dealing with the situation." Several witness testified that Kaarma told them he was "up the last three nights with a shotgun wanting to kill some kids," that "he was going to shoot [the burglars]," and "he was not kidding, [the witnesses] were going to see this on the news." Witnesses testified that Pflager knew the burglars would come back because "we are going to bait them," and that their guns were loaded. Kaarma and Pflager testified to "living in fear" about the burglaries and decided to be "a little proactive."

¶4 In the early morning hours of April 27, 2014, Kaarma and Pflager were at home. Pflager left the garage door partially open to air out after smoking a cigarette. While inside the home, Kaarma and Pflager saw on the security camera an intruder enter their attached garage. The intruder was well into the garage and "jiggling" the car handles. Kaarma took his shotgun, walked out the front door of the home, turned and stood in front of the partially open garage door. Kaarma testified that he shouted into the garage and a voice or "metal on metal" sound came from inside the garage. He testified he thought he was "going to die," then "aimed high," fumbled with the shotgun, and discharged four shots into his garage in a sweeping motion from right to left. Shotgun pellets sprayed the inside garage wall, and several penetrated the home causing damage. The intruder was shot twice, once in the arm and once in the head. The intruder, later identified as Diren Dede, died as a result of his injuries.

¶5 Kaarma was charged with deliberate homicide. A trial was conducted in Missoula County beginning on December 1, 2014. The jury found Kaarma guilty of deliberate homicide. On February 12, 2015, the District Court sentenced Kaarma to seventy years

3

in the Montana State Prison. Kaarma appeals. Additional facts specific to Kaarma's arguments are included below.

## STANDARDS OF REVIEW

¶6 All of the issues raised by Kaarma invoke an application of the abuse of discretion standard. "A district court abuses its discretion if it acts arbitrarily without conscientious judgment or exceeds the bounds of reason resulting in substantial injustice." *Ammondson v. Northwestern Corp.*, 2009 MT 331, ¶ 30, 353 Mont. 28, 220 P.3d 1.

¶7 We review a district court's decisions regarding jury instructions for an abuse of discretion. *Ammondson*, ¶ 30. The standard of review of jury instructions in criminal cases is whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case. *State v. Dunfee*, 2005 MT 147, ¶ 20, 327 Mont. 335, 114 P.3d 217. The district court has broad discretion in formulating jury instructions. *State v. Spotted Eagle*, 2010 MT 222, ¶ 6, 358 Mont. 22, 243 P.3d 402. To constitute reversible error, any mistake in instructing the jury must prejudicially affect the defendant's substantial rights. *Spotted Eagle*, ¶ 6.

¶8 We review for abuse of discretion a trial court's ruling on a motion for change of venue. Section 46-13-203(1), MCA; *State v. Devlin*, 2009 MT 18, ¶ 15, 349 Mont. 67, 201 P.3d 791. In exercising its discretion, the court is bound to uphold the defendant's constitutional right to a trial by an impartial jury. *State v. Kingman*, 2011 MT 269, ¶ 40, 362 Mont. 330, 264 P.3d 1104. The burden to demonstrate an abuse of discretion is on the party seeking reversal of an unfavorable ruling. *Devlin,* ¶ 15.

4

¶9    For a court to presume the defendant was prejudiced by pretrial publicity, a defendant must demonstrate that "an irrepressibly hostile attitude pervades the jury pool or that the complained-of publicity has effectively displaced the judicial process and dictated the community's opinion as to the defendant's guilt or innocence." *Kingman*, ¶ 32. A court can only find presumed prejudice in extreme circumstances amounting to "a circus atmosphere or lynch mob mentality." *Kingman*, ¶ 32. The bar is very high to prove this assertion. *Kingman*, ¶ 32.

¶10   We review for abuse of discretion a district court's denial of a challenge for cause of a prospective juror. *State v. Allen*, 2010 MT 214, ¶ 20, 357 Mont. 495, 241 P.3d 1045. When reviewing challenges for cause, a court abuses its discretion if it fails to excuse a prospective juror whose actual bias is discovered during voir dire or whose statements raise serious doubts about the juror's ability to be fair and impartial. *State v. Heath*, 2004 MT 58, ¶ 7, 320 Mont. 211, 89 P.3d 947; *Allen*, ¶ 25. Errors in the jury selection process are structural; therefore, reversal is required if the district court abused its discretion by denying the defendant's challenge for cause, the defendant uses a preemptory challenge to remove the juror, and the defendant used all of his preemptory challenges. *Heath*, ¶ 7.

¶11   The Montana Supreme Court reviews a district court's evidentiary rulings for abuse of discretion. *State v. Huerta*, 285 Mont. 245, 254, 947 P.2d 483, 489 (1997). This includes the admissibility of character evidence. *Huerta*, 285 Mont. at 254-55, 947 P.2d at 489-90; *accord State v. MacGregor*, 2013 MT 297, ¶ 44, 372 Mont. 142, 311 P.3d 428. A district court has broad discretion to determine whether evidence is relevant and admissible. *State v. Duffy*, 2000 MT 186, ¶ 43, 300 Mont. 381, 6 P.3d 453.

¶12   The district court has great latitude in ruling on the admissibility of expert testimony, and the ruling will not be disturbed without a showing of abuse of discretion. *State v. Stout*, 2010 MT 137, ¶ 59, 356 Mont. 468, 237 P.3d 37.

**DISCUSSION**

¶13   *Issue One:  Did the District Court abuse its discretion by instructing the jury on justifiable use of force in defense of a person?*

¶14   Prior to trial Kaarma notified the court and State he planned to rely on the affirmative defenses of "justifiable use of force in defense of self, others, [and] home," and proposed jury instructions regarding the same.  Kaarma claimed self-defense to the officers responding to the shooting.  During his opening statement, Kaarma's attorney argued Kaarma shot because "in his mind he's going to get attacked."  Kaarma testified he "believed his life was threatened and he was going to get attacked," and that he was "fearful, concerned, and angry."  The defense provided expert testimony regarding his state of mind and the "imminent fear that was occurring."  Kaarma elicited testimony that a person may, depending on the circumstances, protect against a forcible felony in the home, as well as when the person feels his or her life is in danger.  He elicited testimony from witnesses regarding the reasonableness of defending oneself.

¶15   At the jury instruction settlement conference, Kaarma argued the only affirmative defense raised at trial was use of force in defense of an occupied structure and objected to the justifiable use of force in defense of a person and the use of force by aggressor jury instructions.  He argued that § 45-3-102, MCA, defense of person, requires a commensurate response to the nature of the threat, where defense of an occupied

6

structure only requires the actor's reasonable belief that the use of force was necessary to terminate the unlawful entry. Counsel asserted the defendant "gets to pick which justifiable use of force [theory, he] wants to proceed under." The State objected, arguing Kaarma was not inside the occupied structure when he used deadly force and therefore the defense of an occupied structure instruction does not apply.

¶16 The District Court determined the State "has the right to have the justifiable use of force in defense of self" instruction given based on Kaarma's arguments that he was in fear he was about to be assaulted or killed outside of his home. Both defense of an occupied structure and defense of person jury instructions were given. The District Court directed jurors to look at the two types of defenses separately and determine which applied based on the elements of each.

**Discussion**

¶17 Under Montana law a person is justified in the use of force in three primary situations: § 45-3-102, MCA (defense of person), -103 (defense of occupied structure), and -104 (defense of other property—not applicable here).

¶18 Section 45-3-102, MCA, justifies a person to use force against another when the person reasonably believes that the conduct is necessary for self-defense against another's imminent use of unlawful force. That person is only justified to use force likely to cause death or serious bodily harm if the person reasonably believes it is necessary to prevent imminent death or serious bodily harm or to prevent a forcible felony.

¶19 Section 45-3-103, MCA, justifies a person to use force against another when the person reasonably believes it is necessary to prevent or terminate the other person's

7

unlawful entry into or attack upon an occupied structure. That person may be justified to use force likely to cause death or serious bodily injury if, after entry is made or attempted into the occupied structure, the person reasonably believes force is necessary to prevent an assault upon himself or another in the structure, or the person reasonably believes that the force is necessary to prevent the commission of a forcible felony in the occupied structure.

¶20 Justifiable use of force, where a defendant admits to the act but seeks to justify, excuse, or mitigate it, is an affirmative defense. *State v. Erickson*, 2014 MT 304, ¶ 25, 377 Mont. 84, 338 P.3d 598. The initial burden is on the defendant to produce evidence of justifiable use of force. *Erickson*, ¶ 25.

¶21 Once a defendant offers justifiable use of force evidence, the State has the burden to prove beyond a reasonable doubt the defendant's actions were not justified. Section 46-16-131, MCA. In order to meet the initial burden of production, a defendant must do more than give notice of intention to use the defense. *State v. Daniels*, 2011 MT 278, ¶¶ 15-16, 362 Mont. 426, 265 P.3d 623; *State v. R.S.A.*, 2015 MT 202, ¶¶ 35-37, 380 Mont. 118, 357 P.3d 899; § 45-3-131, MCA.

¶22 Kaarma contends he raised only justifiable use of force in defense of an occupied structure at trial and based on the evidence presented at trial only a justifiable use of force in defense of an occupied structure jury instruction should have been given. Kaarma concedes he did put the District Court and State on notice of his intent to use justifiable use of force in defense of a person, but asserts that is not enough to instruct the jury on that defense. Kaarma argues this was an abuse of discretion by the District Court, if not a

8

violation of his right to control his defense pursuant to the Sixth Amendment of the United States Constitution. We disagree.

¶23 A defendant is not bound to rely on his or her affirmative defense proposals at trial. *Daniels*, ¶ 16 (citing *City of Red Lodge v. Nelson*, 1999 MT 246, ¶ 13, 296 Mont. 190, 989 P.2d 300; *State v. Logan*, 156 Mont. 48, 65, 473 P.2d 833, 842 (1970)). If the defense fails to present sufficient evidence regarding justifiable use of force, the defense fails. *Daniels*, ¶ 15. However, the district court must instruct the jury on theories and issues that are supported by evidence presented at trial. *State v. King*, 2013 MT 139, ¶ 25, 370 Mont. 227, 304 P.3d 1.

¶24 The record is clear. During trial Kaarma argued that he shot into the garage, killing Dede, because of the "metal on metal" sound coming from the garage and that sound made him fear for his own life. Without any other evidence, Kaarma's own words gave rise to his justifiable use of force in defense of self-argument and the eventual jury instruction. Moreover, Kaarma proposed jury instructions for defense of self; he elicited expert testimony on his state of mind and "imminent fear" he felt standing at the garage, and elicited testimony regarding when it may be reasonable to use deadly force in defense of self. Kaarma gave notice that he planned to invoke both the affirmative defenses of justifiable use of force in defense of a person and defense of an occupied structure, and at trial he provided evidence to support both theories. Once Kaarma offered justifiable use of force evidence, the State's burden was to prove his actions were not justified. Section 46-16-131, MCA.

9

¶25 The district court must instruct the jury on theories and issues that are supported by evidence presented at trial; therefore, when conflicting evidence is presented, the district court must provide jury instructions on both theories supported by the evidence. *King*, ¶¶ 23-25. A trial court does not abuse its discretion in giving an instruction if it is "supported by either direct evidence or some logical inference from the evidence presented." *Erickson,* ¶ 35; *State v. Hudson*, 2005 MT 142, ¶ 17, 327 Mont. 286, 114 P.3d 210.

¶26 Kaarma argues upholding the jury instructions as given will override legislative intent. We are not convinced. Kaarma cites no Montana authority for his argument. Montana jurisprudence clearly holds that "the trial judge is under a duty to instruct the jury on every issue or theory finding support in the evidence, and this duty is discharged by giving instructions which accurately and correctly state the law applicable in a case." *Erickson*, ¶ 35; *King*, ¶ 25. By instructing the jury based on the evidence, the District Court was upholding its duty.

¶27 The instructions given were a full and fair instruction on the applicable law of the case. The district court is entitled to broad discretion formulating and approving jury instructions. *Spotted Eagle*, ¶ 6. Here, the District Court provided jury instructions, which were supported by either direct evidence or some logical inference from the evidence presented at trial. *Erickson*, ¶ 35; *Hudson*, ¶ 17. As such, we find no error in the jury instructions. The District Court did not abuse its discretion.

¶28 Kaarma also argues the District Court erred by declining to instruct the jury that, as a matter of law, burglary is a forcible felony. This Court will not address either an

10

issue raised for the first time on appeal or a party's change in legal theory. *State v. Weaselboy*, 1999 MT 274, ¶ 16, 296 Mont. 503, 989 P.2d 836. Kaarma clearly and unequivocally withdrew his proposed instruction that burglary is a forcible felony without objection. This issue, raised for the first time on appeal, is not properly before this Court.

¶29 *Issue Two: Did the District Court abuse its discretion when it denied Kaarma's motions to change venue based on pretrial publicity?*

¶30 Missoula County has a population of approximately 110,000 individuals with six major media outlets, including television, newspaper, and radio. It is asserted the local media published some 500 articles or stories on the Kaarma case. The media reported on the affidavit of probable cause, citing it was amended from the original three pages to a twenty-page affidavit and motion for leave to file information. The media reported the new affidavit noted Kaarma's previous bad acts including road rage, his statements that he was "baiting these kids" and "that he would be glad to shoot a cop," suggested he had premeditated the murder, and that he was under the influence when the shooting occurred.

¶31 A Deputy Missoula County Attorney was quoted as stating Kaarma "essentially trapped [Dede] in the garage." Other articles commented on Kaarma's alleged drug use, his "luring" of the victim into his garage, and compared him to a Minnesota man who committed unnerving homicides after luring two burglars into his basement. Local politicians publicly commented on the case, discussing the "castle doctrine" and that it would not protect Kaarma's actions. A former Montana Governor publicly stated that

11

Kaarma intended to "entrap them" and that "the laws of Montana are not going to protect this guy." Offensive epithets were spray painted on his defense attorney's business, online comments were critical of Kaarma, some even called for his death, and threats against their persons were reported by Kaarma and Pflager.

¶32 Articles regarding the case commonly referred to Dede as a victim, portrayed as beloved, and labeled the intrusion into Kaarma's garage as benign as opposed to a forcible felony. Dede's funeral and parents were covered in the media, and some fund drives were established to support his family.

¶33 On July 18, 2014, Kaarma moved to change the trial venue based on presumed prejudice in the community, arguing voir dire would not prevent juror bias. The State argued that Kaarma failed to meet the burden required to presume prejudice in that the publicity surrounding the case was not so inflammatory or so prejudicial that an unbiased jury could not be found in Missoula County. The District Court denied the motion, finding Kaarma failed to meet the burden required for change of venue based on presumed prejudice. The District Court found the publicity had been "by all accounts, factual in nature," and that voir dire was the primary method for determining potential jurors' pretrial biases.

¶34 On August 8, 2014, Kaarma moved to seal and close the pretrial proceedings on the admissibility of his prior bad acts pursuant to M. R. Evid. 404(b). The motion was unopposed. The District Court granted the motion and sealed the pretrial proceedings.

¶35 On September 4, 2014, Kaarma filed a renewed request for change of venue, or alternatively suggested drawing the jury pool from Mineral County or use a jointly

12

prepared jury questionnaire to determine the extent of actual prejudice in Missoula County. The motion was unopposed. The District Court denied the renewed motion holding the motion contained no new compelling legal basis to set aside its earlier order. However, the District Court granted Kaarma's request for a jointly prepared jury questionnaire to assess and remove jurors who, based on an already formed opinion, could not be impartial or fair at trial. The District Court indicated it was cognizant of its "prerogative and legal duty to protect Kaarma's right to a fair trial and impartial jury."

¶36    On or about September 30, 2014, the jury questionnaires were mailed to 300 prospective jurors and 256 were returned. Based on the responses, 89 percent indicated they knew about Kaarma's case, 56 percent noted they had formed an opinion of his guilt or innocence, 42 percent said they would find it difficult to be impartial, and 26 percent indicated they would be unable to render a fair and impartial verdict.

¶37    On November 19, 2014, Kaarma filed a second renewed request for venue change. The basis of this request was a recent media story regarding Kaarma's violent past of child and partner abuse, which most local media outlets ran. The District Court scheduled a hearing the same day. The District Court denied the renewed motion for change of venue, granted Kaarma's motion for a protective order of the 911 tapes, and essentially put a gag order into effect. The District Court informed the parties it would be following the voir dire process closely and would consider a venue change in the future if a fair and impartial jury could not be found.

¶38    The parties stipulated to excuse 51 prospective jurors for cause and the District Court excluded 37 more. Kaarma requested individual voir dire based on the publicity of

13

the trial after the questionnaires were received. The District Court denied individual voir dire noting, "you can't say an informed juror is not qualified," but noting it was looking for jurors who could give Kaarma a "clean slate" and make a decision based only on the facts presented at trial.

¶39 During voir dire, prospective jurors explained they had seen the media reports but would form their opinions based on the facts, were not concerned the defense tried to remove the case from Missoula County, and some even expressed criticism of the media's reporting on the case. The jury was selected and sworn in on December 2, 2014.

¶40 During the trial, a media outlet printed an article on the "castle doctrine," which is a commonly used term for legislation that allows a homeowner to use self-defense and sometimes deadly force in defense of the owner's home or "castle." The District Court conducted individual voir dire of each juror and determined that none had read the article. One juror was excused based on public comments his wife had made regarding Kaarma's guilt. Additionally, a media outlet published a photo of a witness, which included several of the jurors. The District Court denied Kaarma's motion for a mistrial based on the photo.

**Discussion**

¶41 A prosecutor must file criminal charges in the county where the defendant committed the offense, and the trial must take place in the same county unless otherwise provided by law. Section 46-3-111(1), MCA; *State v. Adams*, 190 Mont. 233, 235, 620 P.2d 856, 857 (1980). The Montana and United States Constitutions guarantee a defendant a right to a fair trial by an impartial jury. Mont. Const. art. II, §§ 17, 24; U.S.

14

Const. amend. VI. Accordingly, Montana law provides if in the county in which prosecution is pending the district court finds there exists "such prejudice that a fair trial cannot be had in the county," then the court is required to transfer the case to another county, direct that a jury be selected from another county, or take any other action designed to ensure that a fair trial may be had. Section 46-13-203(1), (2), MCA.

¶42 Kaarma argues the District Court should have granted his motion for change of venue; that under Montana and federal law, the facts show prejudice should have been presumed (as opposed to actual prejudice) based on the significant publicity the case attracted in Missoula County. He argues Missoula's size and community characteristics alone prove presumed prejudice. Without support, he argues prejudice should be presumed within a smaller community because with a smaller jury pool no unbiased jury could be pulled. He argues Missoula County is a small community with around 111,800 individuals (citing *Skilling v. United States*, 561 U.S. 358, 382, 130 S. Ct. 2896, 2915 (2010) (a community of 150,000 people was small)). Kaarma recites the news media circulation specifics and that some 500 news articles (from television, to print, to radio) were published covering his case. He asserts this number was exponentially larger than in some cases where presumed prejudice was found. *See Callahan v. Lash*, 381 F. Supp. 827 (N.D. Ind. 1974).

¶43 However, extensive publicity alone is not sufficient. Informed jurors are not biased jurors. Presumed prejudice is found where "pretrial publicity is so pervasive and prejudicial that we cannot expect to find an unbiased jury pool in the community." *Kingman*, ¶ 21. In order to establish presumptive prejudice the defendant must show that

15

"an irrepressibly hostile attitude pervades the community" and that the publicity "dictates the community's opinion as to guilt or innocence." *Kingman*, ¶ 24 (citing *United States v. Abello-Silva,* 948 F.2d 1168, 1176 (10th Cir. 1991). Stated otherwise, the defendant must show that the publicity is inflammatory and the publicity actually did inflame the prejudice of the community so that no unbiased jury could be found. *Devlin*, ¶ 17.

¶44 The seminal United States Supreme Court case on presumed prejudice, *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417 (1963), found the district court abused its discretion by failing to grant a change of venue. *Rideau*, 373 U.S. at 726, 83 S. Ct. at 1419. There the defendant confessed to murder in police custody and his videotaped confession was broadcast three times over the local television station two weeks before trial. *Rideau*, 373 at 724-25, 83 S. Ct. at 1418-19. The Supreme Court reasoned that the confession was a "spectacle," had derailed due process, and "in a very real sense was his trial." *Rideau,* 373 U.S. at 726, 83 S. Ct. at 1419.

¶45 In *Rideau*, "the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged." *Rideau*, 373 U.S. at 726, 83 S. Ct. at 1419. While it is true Kaarma experienced significant media coverage of his case, we do not agree that the media coverage was as significant and pervasive as the televised confession in *Rideau*. Although Kaarma acknowledged some of the alleged acts, he never confessed to committing the crime, nor was a confession released by the police and broadcast throughout the community.

16

¶46　The nature of the media coverage was not so inflammatory or sensational that community sentiment was against him to the extent an unbiased jury could not be found. Inflammatory publicity is that which community members could not ignore and "invites prejudgment of the defendant's culpability." *Kingman*, ¶ 42. Kaarma cites a long list of actions that inflamed the community and prejudiced it against him: the published prosecutor's comments about Kaarma's luring and trapping Dede in his garage; the charging affidavit's accusations; the articles published during the trial regarding his child abuse and domestic violence; the articles published indicating Kaarma was violent and a drug user; the jury pool questionnaire responses; community sympathy for Dede; and the sheer volume of articles regarding the case. However, none of these are so inflammatory as to invite prejudgment of Kaarma's guilt.

¶47　Kaarma argues the publication of statements made by the prosecutors and law enforcement officers were inflammatory, citing *State ex rel. Coburn v. Bennett*, 202 Mont. 20, 655 P.2d 502 (1982), in support. In *Coburn*, this Court held that a change of venue should have been granted based on inherent prejudice. *Coburn,* 202 Mont. at 34, 655 P.2d at 509. Coburn was charged with aggravated kidnapping and sexual intercourse without consent; bail was set at $100,000, then reduced to $15,000, which was posted and Coburn was released. *Coburn*, 202 Mont. at 22, 655 P.2d at 503.

¶48　The media coverage in *Colburn* was sensational. The outrage in the community was clear: angry citizens marched on the courthouse; public meetings were held; community organizations were established; significant and widespread vandalism occurred; and threats were made against the Judge and Coburn. *Coburn*, 202 Mont. at

17

22-30, 655 P.2d at 503-06. Local news articles quoted some of the statements made by the sheriff, the county attorney, and a deputy county attorney that were inflammatory and prejudicial to the defendant. *Coburn*, 202 Mont. at 23-30, 655 P.2d at 503-07. The statements included "he picked the wrong little girl," as well as citing that the Sheriff's reaction to the reduction in bail was "unprintable." *Coburn*, 202 Mont. at 23, 31, 655 P.2d at 503, 507. This Court determined the newspaper went beyond objective dissemination of information; instead it "inflamed an already angry populace." *Coburn*, 202 Mont. at 30-31, 655 P.2d at 507.

¶49 While comments made by the county attorney and sheriff in *Coburn* did stoke the inflammatory nature of the media coverage, the situation here is dramatically different. Most of the comments cited by local media came directly from the charging affidavit or court proceedings. A deputy county attorney commented, in a telephone interview with a local newspaper, that "[Kaarma] actually sought Dede out by essentially trapping him in the garage," adding that every gun instructor tells students to identify the target before firing. However, no one marched on the courthouse calling for judges to resign, no community organizations developed, nor were public meetings held. The public statements were not inflammatory.

¶50 While publicity surrounding the case was significant, we do not agree that it was so inflammatory or so prejudicial that a community member could not ignore it or that it invited prejudgment of Kaarma's culpability significant enough to grant a change of venue. *Kingman*, ¶ 42. The District Court did not find community sentiment to be

18

enraged against Kaarma like the community in *Coburn*. Montana case law does not require a finding of presumed prejudice based on the facts in this case.

¶51 Kaarma raises two additional errors: the District Court's order sealing and closing the M. R. Evid. 404(b) proceedings and its denial of individual voir dire about the publicity of Kaarma's criminal history. The M. R. Evid. 404(b) proceedings were sealed in response to Kaarma's own unopposed motion and therefore he cannot now assert error. *See State v. Dewitz*, 2009 MT 202, ¶ 53, 351 Mont. 182, 212 P.3d 1040; *State v. Smith*, 2005 MT 18, ¶ 10, 325 Mont. 374, 106 P.3d 553; *State v. Harris*, 1999 MT 115, ¶ 32, 294 Mont. 397, 983 P.2d 881 ("We will not put a district court in error for an action in which the appealing party acquiesced or actively participated."); *McDonald v. McNinch*, 63 Mont. 308, 316, 206 P. 1096, 1098 (1922) ("A party who participates in or contributes to an error cannot complain of it.").

¶52 Significantly, Kaarma's argument regarding individual voir dire is misplaced. On appeal, Kaarma is asserting the District Court should have presumed prejudice based on the extent and nature of the publicity alone. However, individual voir dire is available to assess each potential juror for actual prejudice; by definition it does not address the issues raised regarding presumed prejudice. *State v. Griego*, 2016 MT 207, ¶ 25, 384 Mont. 392, 377 P.3d 1217.

¶53 The bar facing the defendant seeking to prove presumed prejudice is "extremely high." *Kingman,* ¶ 24; *Griego*, ¶ 25. The principle of presumed prejudice is "rarely applicable" and as such is reserved for "extreme situations." *Kingman,* ¶ 24.

19

¶54    There are numerous protective tools available to a trial court when issues regarding community prejudice are presented.  To ensure Kaarma received a fair trial here the District Court sealed and closed the M. R. Evid. 404(b) proceedings, ordered an enhanced jointly created jury questionnaire, issued a "gag" order and protective order, ensured liberal excusals on stipulation of the parties, and allowed a full two-day voir dire process.  Additionally, the District Court conducted individual voir dire after the media published an article about the castle doctrine and excused a juror mid-trial whose spouse had been discussing the case.

¶55    Kaarma has not proven the pretrial publicity was so pervasive and prejudicial that the District Court was required to change the venue.  Publicity may be wide spread, but communities are rarely listening closely.  The questionnaire tally showed almost 90% of polled potential jurors indicated they had heard of the criminal charges against Kaarma, and 26% had heard enough to be unable to render a neutral verdict.  Obviously, these jurors were excused prior to the commencement of the trial.  Here, the District Court, in response to Kaarma's assertions of prejudice, used the tools available to it, the questionnaire and voir dire.  To ensure Kaarma received a fair trial the District Court's use of the questionnaire and voir dire was appropriate.

¶56    This Court has noted:

> Living, as we do, in a society which is continuously inundated with news coverage by the print and broadcast media, it is doubtful that most members of the community will not share some knowledge of, or about, a locally high-profile crime, and the various persons allegedly involved in its commission or in its investigation.  Given the inevitable conflict with the media's constitutional right of free speech, the public's constitutional right to know, and the accused's constitutional right to a fair trial, it remains the

20

task of the district court, in such cases, to scrupulously examine the evidence supporting a motion for change of venue to insure that the jurors who will ultimately decide the guilt or innocence of the accused are fair minded and uninfluenced by what they may have seen, heard or read. That conclusion must necessarily be based upon not only the jurors' responses in voir dire, but also on a careful analysis of the quantity and content of the pretrial publicity. Each case is unique and must be decided on its own merits.

*Devlin*, ¶ 35.

¶57 Kaarma failed to establish facts sufficient for the District Court to have found presumed prejudice. The publicity surrounding Kaarma's trial did not rise to the level of an extreme circumstance, amounting to a "circus atmosphere or lynch mob mentality." *Kingman*, ¶ 24. Kaarma has not reached the very high bar required to convince this Court that we should presume the community was so prejudiced against the defendant that a fair trial could not have been conducted.

¶58 The District Court is entitled to great deference; it was in the best position possible to determine the nature and extent of prejudice against Kaarma in both the community and potential jurors. *Kingman* ¶ 40; *Stevenson v. Felco Indus*. 2009 MT 299, ¶ 32, 352 Mont. 303, 216 P.3d 763. The District Court, in considering the issue multiple times, did not act arbitrarily without the employment of conscientious judgment or exceed the bounds of reason. Accordingly, we hold that the District Court did not abuse its discretion when it denied Kaarma's motions for change of venue.

¶59 *Issue Three: Did the District Court abuse its discretion when it declined to remove a prospective juror for cause based on her marriage to a former police officer?*

¶60 Prior to trial the District Court ordered that "any prospective juror who is in law enforcement, or related to anyone in law enforcement in the following manner: spouse, child, or parent, will be automatically excused from the jury panel." Juror Kathryn Hughes' (Hughes) husband was both the former chief of police for Hamilton, Montana, and assistant chief of police for Missoula, Montana. She also knew a state witness and lead investigator on the case, Detective Guy Baker (Baker) as a young child. During the two days of voir dire Hughes affirmed that irrespective of her associations, her ability to be impartial was absolute, stating, "I think I have a fair mind and I can make up my own mind."

¶61 Kaarma sought to remove Hughes for cause, arguing the court order excusing jurors related to law enforcement clearly should have removed Hughes. Kaarma argued Hughes was too close to law enforcement, as even the District Court judge acknowledged that he personally knew Hughes and noted that her husband had been retired for twenty plus years.

¶62 The State objected to the removal. It argued the purpose of automatically excusing jurors related to law enforcement personnel was because that juror might know officers or others working on the case and because of that relationship, they could not be impartial. The District Court did not excuse her stating, "let's see what you shake up on voir dire."

¶63 During voir dire, Hughes stated "[Kaarma's] fighting for his life and we're—on the police investigation, I just believe it's going to be more accurate, true. Whereas the defendant, you know, he's going to fight for his life, so he's going to say something that's maybe not quite true because, you know, he's fighting for his life." Kaarma's attorney asked her "so you would treat him differently?" To which Hughes' responded "well, no, oh no, I wouldn't treat it differently. I'm just telling you that I think he's going to be—he would be more apt, maybe, to stretch the truth a little bit, maybe that's what I want to say. I would not treat it any differently, I'm just looking at his point of view." Kaarma again sought to remove Hughes for cause.

¶64 The State again objected to the removal, arguing Hughes clearly stated she would not treat police and Kaarma differently. Further, she was allowed to consider the defendant's motivation to lie when determining Kaarma's credibility. The District Court declined to remove her for cause. Kaarma continued questioning Hughes, eliciting statements that she would "listen to both sides," "be very honest," and that "my mind is my mind." Kaarma did not renew his challenge for cause. Kaarma used a preemptory challenge to remove Hughes from the jury. Kaarma used all six of his preemptory challenges.

**Discussion**

¶65 Kaarma argues the District Court abused its discretion by failing to remove Hughes for cause. He argues both that Hughes should have been removed based on her substantial ties to law enforcement and her expressed bias against Kaarma. In a criminal trial, a party may challenge a prospective juror based on the juror's inability to be

23

impartial or act without prejudice. *State v. Allen*, 2010 MT 214, ¶ 25, 357 Mont. 495, 241 P.3d 1045; § 46-16-115(2)(j), MCA. This Court has noted, however, that "in reality, few people are entirely impartial regarding criminal matters." *Allen*, ¶ 26. Therefore, the District Court must make a determination, based on the totality of the circumstance, whether a juror can "convincingly affirm [her] ability to lay aside any misgivings and fairly weigh the evidence." *Allen*, ¶ 26. If the juror cannot, the District Court must remove the juror for cause.

¶66 Kaarma relies on *Allen* to support removing Hughes for cause. In *Allen,* this Court determined that the District Court abused its discretion for failing to remove a juror for cause after the juror stated he would be partial to testimony by police officers involved in the case, whom he knew professionally and personally. *Allen*, ¶¶ 27, 30.

¶67 The cases are distinguishable; the juror in *Allen* is not in a similar relationship to Hughes, the juror here. The prospective juror in *Allen* was very clear that he did not care if the defendant was guilty or not, wouldn't listen to all of the evidence, and if the trial went beyond two days all bets were off on how he would choose to decide the case. *Allen*, ¶¶ 28-29. Despite the juror's repeated refusal to uphold the law or his duty as a juror the District Court refused to remove him for cause. *Allen*, ¶ 30.

¶68 This Court has repeatedly held that "the mere fact that a prospective juror is connected with law enforcement does not, without more, necessitate a finding that he or she would not be an impartial juror." *State v. Lamere*, 2005 MT 118, ¶ 17, 327 Mont. 115, 112 P.3d 1005 (citing *State v. Deschon*, 2004 MT 32, ¶ 41, 320 Mont. 1, 85 P.3d 756.) Here, Hughes was very clear, through her questionnaire and voir dire, that she

would render her decision impartially, that she would listen to all of the evidence before deciding, and that she did not associate with any current law enforcement employees. While Hughes knew Baker as a child, she was not currently associated with him.

¶69 The pretrial District Court order did not apply to Hughes. Her marriage to a former policeman was not specifically listed. Voir dire did not establish Hughes harbored actual bias nor did her statements raise serious doubts about her ability to be fair and impartial. *Heath*, ¶ 7; *Allen*, ¶ 25. The district court is in the best position to judge credibility. *See State v. Ring*, 2014 MT 49, ¶ 14, 374 Mont. 109, 321 P.3d 800. The District Court did not abuse its discretion when it denied Kaarma's motion to remove juror Hughes for cause.

¶70 *Issue Four: Did the District Court abuse its discretion when it admitted evidence of Kaarma's prior assault on Pflager?*

¶71 In the State's case-in-chief, Pflager testified that she was afraid the burglars were going to harm her and her family; her primary concern was her child. When asked by the prosecutor why she left the garage door open considering her fear, she stated she assumed Kaarma would smoke a cigarette after her and close the garage door. Without prompting, Pflager further explained that Kaarma was "our protector," and he took that job very seriously. The State made no comment nor asked any questions regarding the statement.

¶72 On cross-examination, the defense specifically elicited additional testimony from Pflager regarding Kaarma's character as it related to him being the "protector of the family." Pflager testified that Kaarma was "old school" and "very traditional." She

elaborated stating "he understands . . . family is very traditional values, meaning that he's supposed to be able to protect me from any danger and from any threat, any bad thing."

¶73   The State argued that this inquiry by the defense opened the door to Kaarma's character.  Specifically, a prior assault by Kaarma on Pflager, which had been excluded by stipulation, could now be used to impeach Pflager's portrait of Kaarma as a protector. Kaarma objected based on remoteness, the high likelihood of prejudice under M. R. Evid. 403, and that in the two years since the assault, the family's circumstances had changed. The District Court determined the "door had been opened" but that the fact Kaarma had been charged with assault was too prejudicial, thus outweighing the probative value based on M. R. Evid. 403.  The District Court allowed a limited inquiry into the act.  On redirect, the State asked Pflager about Kaarma physically assaulting her, which Pflager confirmed.

**Discussion**

¶74   Generally, evidence of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion.  M. R. Evid. 404(a); *State v. Dist. Court of the Eighteenth Judicial Dist.*, 2010 MT 263, ¶ 64, 358 Mont. 325, 246 P.3d 415.  However, the character of the accused may be rebutted by the prosecution when the defendant offers evidence of a pertinent trait.  M. R. Evid. 404(a)(1).  It is axiomatic that when a defendant first offers evidence of good character, the State may then present rebuttal evidence of bad character.  *State v. Hayden*, 2008 MT 274, ¶ 22, 345 Mont. 252, 190 P.3d 1091; *State v. Gowan*, 2000 MT 277, ¶ 23, 302 Mont. 127, 13 P.3d 376; M. R. Evid. 404(a)(1).

¶75 Here the State asked Pflager a question about leaving her garage door open, Pflager answered the question and stated Kaarma was the family's protector. It was Kaarma who then brought forth Pflager's testimony on cross-examination, encouraging her to expand on her statement that he was a protector and specifically asked her to expand on "what his role was in your family." "If a defendant raises an issue when cross-examining a witness, the prosecution may re-examine the witness to elaborate and explain what is already in evidence." *Hayden*, ¶ 22; *Duffy*, ¶ 43.

¶76 Kaarma elicited specific testimony from Pflager about his good character; he was the family's protector. The State then had the right to present other character evidence to rebut it. The District Court did not abuse its discretion.

¶77 *Issue Five: Did the District Court abuse its discretion when it allowed lay opinion testimony regarding blood spatter evidence?*

¶78 Detective Baker testified at trial regarding his personal observations of the blood patterns in Kaarma's garage and his interpretation about where Kaarma was standing when the shooting occurred. Baker testified that Dede's injured arm transferred blood to a vehicle in the garage when Dede crouched behind it. He inferred that Dede then stood up and Kaarma shot, hitting Dede, resulting in a blood spray pattern on the garage wall behind him. Specifically, Baker testified:

> [Baker:] I see a vent of blood transfer that's on the rear bumper of the Buick that was parked in the garage. It's on the driver's side.
> [Prosecutor:] When you say "blood transfer," what are you saying?
> [Baker:] There was a blood source that came in contact with the vehicle and left the blood in that position.
> [Prosecutor:] Go ahead and continue.
> [Baker:] There was also an event of high-speed spatter that's over this transfer. So blood acts consistent with physics, and force acting upon blood

27

is consistent. So if you have low-speed spatter, for example, that would be spatter that's about 4 millimeters in size or greater and it would be caused by something that's traveling about up to 5 feet per second, like a punch.

Medium velocity spatter would be a little smaller because as the velocity increases the size of spatter decreases. That would be an object traveling up to 20 feet per second, approximately. That would be something with a fulcrum, like say a hammer or baseball bat, that gives that added velocity at the end, and that blood spatter would be about 1 to 4 millimeters in size.

Then you have high-speed spatter, which is greater than a hundred feet per second, so an object traveling greater than a hundred feet per second could be high-speed trauma, like a machinery accident. It could be bullets. It could be explosions. So the greater the velocity, the smaller the [spatter]. With a bomb, sometimes the spatter is mis[t]ed because of the greater velocity.

Blood acts in connection with the velocity that acts upon it, and there's high-speed spatter on . . . [the back] of this Buick that would be consistent with a shotgun wound to the head being sustained by Diren at the back of this vehicle.

The testimony was elicited when the State sought to provide the jury with the location of Dede and Kaarma during the shooting.

¶79 Baker, the Montana State Crime Lab firearm and tool mark examiner, Travis Spinder (Spinder), and an expert for the defense, Lance Martini (Martini) all provided consistent reports regarding where Kaarma was standing when the shooting occurred. Each agreed that Kaarma's version of where he stood was irrefutable. Martini was disclosed as a defense expert and prepared an expert report, which Baker and Spinder both read prior to their testimony. However, Martini did not testify at trial.

¶80 At trial, the State argued Baker based his opinions on his experience with crime scenes, training, and "common sense" perception based on his years as a police officer. Baker had been with the Missoula police department for almost 25 years, the last 14 as a police detective. He had participated in over 120 hours of homicide investigation training

and 40 hours of shooting reconstruction training including blood spatter. He attended basic police training at the Montana Law Enforcement Academy, almost 2,300 hours of post-academy certified training, and obtained significant in-service training and experience through over 750 career cases.

¶81 Kaarma objected multiple times during the testimony, asserting Baker was offering expert testimony as a lay witness and the defense did not secure a rebuttal witness, resulting in prejudice. The District Court heard arguments outside the presence of the jury on the issue and held Baker was offered as a lay witness, the State was not required to disclose him as an expert, and that he has "established his qualification to render an opinion on the blood spatter." Kaarma vigorously cross-examined Baker on his lack of education and training, elicited testimony that Baker was not sure what certain technical terms meant or what procedures and practices there were for testing blood at the crime scene, and blood samples in general.

**Discussion**

¶82 The district court has great latitude in ruling on the admissibility of expert testimony, and the ruling will not be disturbed without a showing of abuse of discretion. *State v. Stout*, 2010 MT 137, ¶ 59, 356 Mont. 468, 237 P.3d 37.

¶83 Kaarma argues Baker should not have been allowed to testify on blood spatter based on his common sense and training; rather he testified as an expert regarding the scientific and technical aspects of blood spatter. Kaarma argues that Baker should have been disclosed as an expert; had the disclosure been made, the defense would have secured a rebuttal witness. Kaarma asserts the District Court abused its discretion. The

29

State counters that Baker was disclosed as a lay witness, Baker had the experience and training to testify based on his own perception as to the blood patterns he personally observed as a lay witness, and Kaarma had the opportunity to cross-examine him. Therefore, his testimony was appropriate under M. R. Evid. 701.

¶84    M. R. of Evid. 701 authorizes a lay witness to give an opinion, which is "based on the [witness's] perception," and is helpful for a clear understanding of the witness's testimony or a fact in issue. *State v. Nobach,* 2002 MT 91, ¶ 14, 309 Mont. 342, 46 P.3d 618. M. R. Evid. 702 governs expert testimony. Expert witnesses use their "scientific, technical, or other specialized knowledge" to assist the fact finder in understanding evidence or determining facts. M. R. Evid. 702. Expertise is based on "knowledge, skill, experience, training, or education." M. R. Evid. 702. Professional persons such as detectives, firefighters, paramedics, doctors, and dentists can testify under either M. R. Evid. 701 or 702; however, their testimony must comply with each rule accordingly.

¶85    Montana jurisprudence allows and this Court has condoned the practice of a police officer testifying as a lay witness under M. R. Evid. 701, to the officer's perceptions and conclusions based on extensive experience and training. *Dewitz,* ¶ 40; *State v. Zlahn,* 2014 MT 224, ¶ 33, 376 Mont. 245, 332 P.3d 247 (officer testifying about inferences drawn from extensive experience dealing with criminals and administering gunshot residue testing); *State v. Frasure,* 2004 MT 305, ¶ 17, 323 Mont. 479, 100 P.3d 1013 (officer testimony as to whether a criminal defendant possessed drugs with an intent to sell, based on their training and experience as to the methods used in the illicit drug

trade); *Hislop v. Cady*, 261 Mont. 243, 249, 862 P.2d 388, 392 (1993) (officer testimony regarding the cause of an accident based on the officer's experience in accident investigation). *See also State v. Henderson*, 2005 MT 333, ¶ 16, 330 Mont. 34, 125 P.3d 1132 (firefighter's testimony about "pour patterns" in analyzing cause of a fire).

¶86 However, if testimony crosses from lay to expert testimony the witness must be recognized as an expert by the court or error occurs. Testimony offered beyond the scope of M. R. Evid. 701 is expert testimony and should not be admitted as lay testimony. *See Massman v. Helena*, 237 Mont. 234, 242, 773 P.2d 1206, 1211 (1989) (holding that a firefighter's testimony based on "specialized, technical knowledge" was beyond the scope of M. R. Evid. 701); *Nobach*, ¶ 22 (holding a highway patrol officer's testimony about the effects of prescription drugs on the defendant's driving ability was expert opinion testimony under M. R. Evid. 702 and required the proper foundation); *Christofferson v. City of Great Falls,* 2003 MT 189, ¶ 49, 316 Mont. 469, 74 P.3d 1021 (holding paramedics' testimony "clearly extends beyond the men's observations at the scene or a description of their actions, and into the realm of expert medical opinion.").

¶87 Here, Baker's testimony was not proper under M. R. Evid. 701. While Baker's opinions were rationally related to his personal perceptions at the crime scene, they were based on his expertise and experience as a police detective. Baker's descriptions of high velocity versus low velocity blood spatter were expert testimony. As such Baker should have been noticed as an expert and the defense should have had the opportunity to challenge his qualifications as an expert. The District Court abused its discretion by allowing Baker to testify in this manner.

¶88    In order to determine if an alleged error prejudiced a criminal defendant's right to a fair trial, this Court has adopted a two-part test. *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, 32 P.3d 735. The first step is to determine if the error was structural or trial error. *Van Kirk*, ¶ 37. Structural error usually affects the framework of the trial, precedes the actual trial, and is presumptively prejudicial. *Van Kirk*, ¶¶ 38-39. Trial error usually occurs during the trial's presentation of evidence and is not presumptively prejudicial. *Van Kirk*, ¶ 40. This type of error is subject to review under the harmless error statute, § 46-20-701(1), MCA.

¶89    Here, the District Court's abuse of discretion was trial error as it occurred during the presentation of evidence. *Van Kirk*, ¶ 40. Therefore, under § 46-20-701(1), MCA, we must determine if the error was harmless or prejudicial thus necessitating reversal. This Court must determine if there is a reasonable possibility that the inadmissible evidence might have contributed to Kaarma's conviction. *Van Kirk*, ¶ 42. In order to determine this we use a "cumulative evidence" test. *Van Kirk*, ¶ 43. Inadmissible evidence will not be found prejudicial so long as the jury was presented with "admissible evidence that proved the same facts as the tainted evidence proved." *Van Kirk*, ¶ 43. This presented evidence must be admissible and of the same quality of the tainted evidence such that there was no reasonable possibility that it might have contributed to the defendant's conviction. *Van Kirk*, ¶ 44. This is particularly imperative where the inadmissible evidence goes to the proof of an element of the crime charged.

¶90    Here, Baker's testimony regarding the blood spatter was cumulative. The Montana State crime lab's expert witness, Spinder, testified as to where Kaarma was

32

standing when he shot into the garage. Further, Spinder testified that Martini's (Kaarma's expert) report was consistent with his own determination of where Kaarma was standing. Baker also testified that Spinder's theory was consistent with his own theory. Baker, Spinder, and Martini all agreed with Kaarma's version of the story as to where he was standing when he shot. There was no reasonable possibility that the inadmissible evidence might have contributed to a conviction, as qualitatively similar admissible evidence was given. *Van Kirk*, ¶ 42. Moreover, the blood spatter and the location of Kaarma were not central points in the trial and under these circumstances were not germane to the specific elements of the crime of deliberate homicide. *See* § 45-5-102(1), MCA.

¶91 The record does not show that the error was prejudicial to Kaarma's defense. Section 46-20-701(1), MCA. The District Court abused its discretion when it allowed Baker to testify as an expert witness. However, we find that the error was harmless.

## CONCLUSION

¶92 The District Court did not abuse its discretion. The jury instructions given were a full and fair instruction on the applicable law of the case. The District Court was in the best position possible to determine the nature and extent of prejudice against Kaarma in both the community and potential jurors. We are satisfied that the District Court, in considering pretrial publicity, did not act arbitrarily without the employment of conscientious judgment or exceed the bounds of reason. Kaarma was unable to establish that the District Court should have presumed prejudice.

¶93 The District Court's pretrial order removing jurors based on direct relationships with police employees did not apply to Hughes. Voir dire did not establish Hughes harbored actual bias nor did her statements raise serious doubts about her ability to be fair and impartial. The District Court was in the best position to judge her credibility.

¶94 Kaarma opened the door to his good character; the State then had the right to present bad character evidence to rebut it.

¶95 The District Court abused its discretion when it allowed Baker to testify as an expert witness. However, Kaarma's right to a fair trial was not prejudiced. We find that the error was harmless.

¶96 In conducting this trial, the District Court did not act arbitrarily without conscientious judgment or exceed the bounds of reason resulting in substantial injustice. The District Court did not abuse its discretion.

¶97 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JIM RICE