FILED

08/26/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0369

DA 22-0369

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 190

STATE OF MONTANA,

     Plaintiff and Appellee,

  v.

ERIN ELLIOT HOLCOMB,

     Defendant and Appellant.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Teton, Cause No. DC-21-010
Honorable Robert G. Olson, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Tammy A. Hinderman, Appellate Defender Division Administrator,
Gregory Hood, Assistant Appellate Defender, Helena, Montana

     For Appellee:

          Austin Knudsen, Montana Attorney General, Mardell Ployhar,
Assistant Attorney General, Helena, Montana

          Joe Coble, Teton County Attorney, David Buchler, Meghann
Paddock, Special Deputy County Attorneys, Choteau, Montana

Submitted on Briefs:  June 11, 2025

Decided:  August 26, 2025

Filed:

                    _____
                           Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Erin Holcomb appeals his conviction of deliberate homicide following a jury trial in the Ninth Judicial District Court.  Holcomb contends that the District Court improperly refused his request for a justifiable use of force instruction.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     Trysten Fellers lived with his fiancée Josie Moline outside Fairfield.  One afternoon in May 2021, Trysten and Josie invited Grayce Hayden and her boyfriend Nate Jenkin over for dinner.  After dinner, the four friends took a drive into the mountains near Augusta, drinking alcoholic seltzers on the way.  During the drive, Grayce invited three other friends over to Trysten and Josie's house.  The group returned to the house before Grayce's friends—Erin Holcomb, Blake Annis, and Teigan Kelly—arrived.  Erin, Blake, and Teigan had spent their day building a dirt bike track, shooting guns, and drinking.

¶3     Erin brought his handgun into the house and kept "fidgeting with" and "flashing it around," taking it out and putting it back in his waistband holster.  The group continued drinking until eventually Trysten became frustrated and asked everyone to leave.  Trysten planned to drive Erin, Blake, and Teigan home because they were too drunk to drive.  Grayce saw Erin, Blake, and Teigan get into Teigan's truck with Erin in the driver's seat, but when Trysten asked Erin to get out of the driver's seat, he would not budge.  Trysten became angry with and raised his voice at Erin—from inside Nate heard a "[s]pirited, but not physical" argument.

¶4     Shortly after midnight, Trysten called his dad Sonny, who lived about a mile away, and asked him to help get the guests in vehicles and drive them home.  Trysten and Grayce

2

took Teigan back into the house while Blake remained in Teigan's truck. At this point, Josie, Grayce, Nate, and Teigan were inside. When Sonny arrived, he watched Erin exit Teigan's truck and run into the darkness between Trysten's house and Trysten's adjacent shop. Sonny was walking between the two buildings to look for Erin when he heard Trysten's old farm truck start. As Sonny walked around the shop, he saw the farm truck slowly leave the driveway, crawl through a deep ditch, and drive out to Erin in a field. Sonny watched the truck make a single lap around Erin and stop with its lights illuminating Erin so Sonny could see him. After the truck stopped, Sonny heard a gunshot.

¶5 Sonny ran out to the truck and found Trysten lying outside the driver's side door with a gunshot wound in the upper part of his chest. Sonny lifted Trysten into the truck and drove back to Sonny's house, where Trysten later died. Law enforcement arrested Erin the next morning.

¶6 The State charged Erin with deliberate homicide. The case proceeded to a five-day jury trial in March 2022. Defense counsel requested a justifiable use of force jury instruction, arguing that the evidence showed that Erin was afraid of Trysten because Trysten had assaulted him and chased him in the truck before the shooting. The District Court denied Erin's request, reasoning that the evidence did not support a finding that Erin was in imminent danger of death or serious bodily injury. After hearing extensive testimony, the jury found Erin guilty of deliberate homicide. Erin appeals the District Court's refusal of the instruction on justifiable use of force.

**STANDARD OF REVIEW**

¶7     This Court reviews decisions regarding jury instructions for an abuse of discretion. *State v. Daniels*, 2011 MT 278, ¶ 38, 362 Mont. 426, 265 P.3d 623 (citation omitted).  A court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason, resulting in substantial injustice.  *Montanans Against Irresponsible Densification, LLC, v. State*, 2024 MT 200, ¶ 8, 418 Mont. 78, 555 P.3d 759 (citation omitted).  Our review of jury instructions asks "whether the instructions, taken as a whole, fully and fairly instructed the jury on the law applicable to the case." *State v. Fredericks*, 2024 MT 226, ¶ 11, 418 Mont. 220, 557 P.3d 32 (quoting *State v. Cybulski*, 2009 MT 70, ¶ 34, 349 Mont. 42, 204 P.3d 7).

**DISCUSSION**

¶8     Erin argues that there was sufficient evidence at trial to support a justifiable use of force instruction.  Section 45-3-102, MCA, provides that a "person is justified in the use of force likely to cause death or serious bodily harm only if the person reasonably believes that the force is necessary to prevent imminent death or serious bodily harm to the person . . . ."  This statute "allows a person to use force to defend himself or herself in a degree commensurate with the threat of harm the person faces." *State v. Lackman*, 2017 MT 127, ¶ 15, 387 Mont. 459, 395 P.3d 477 (quoting *State v. Archambault*, 2007  MT 26, ¶ 15, 336 Mont. 6, 152 P.3d 698).  The district court must give the justifiable use of force instruction if the theory is "'supported by evidence presented at trial,' even if conflicting evidence is also presented." *State v. Marquez*, 2021 MT 263, ¶ 17, 406 Mont. 9,

4

496 P.3d 963 (quoting *State v. Kaarma*, 2017 MT 24, ¶ 25, 386 Mont. 243, 390 P.3d 609). The court must give the instruction whether the evidence is direct or stems from "some logical inference." *Marquez*, ¶ 17 (quoting *State v. Erickson*, 2014 MT 304, ¶ 35, 377 Mont. 84, 338 P.3d 598).

¶9 Erin contends trial testimony established that Trysten "forcibly dr[agged] [Erin] out of Teigan's truck and threw him on the ground before following him out into the stubble field." The evidence, Erin argues, shows that Trysten had two rifles by his side as he "pursued" Erin out into the field. Erin also points to his own father's testimony at trial—that Erin "called me, and he told me he had shot somebody, and he wanted me to come get him because he was scared because there was people trying to kill him"—as evidence that Erin reasonably believed he was in imminent danger of death or serious bodily harm. Erin claims that the jury instruction was further supported by his call after the shooting to a friend, Michael Siller, in which he sounded frightened. Trysten's farm truck had a bullet hole in it and some witnesses heard multiple gunshots, two pieces of evidence that, Erin argues, together support the logical inference that Trysten and Erin exchanged gunfire and Erin feared for his life.

¶10 Asserting that "statements of counsel are not evidence," *State v. Stuart*, 2001 MT 178, ¶ 22, 306 Mont. 189, 31 P.3d 353, the State responds that Erin relies on statements of his trial counsel rather than the admitted testimony, which shows he had no reasonable belief that Trysten would harm him. The State contends the evidence does not support Erin's arguments that Trysten threw him out of the truck; that Trysten sped after Erin into

5

the field; or that the bullet hole showed Trysten fired at Erin from inside the truck. Erin's calls to his father and his friend, the State maintains, demonstrate only a generalized fear but do not provide specific evidence that Erin was afraid of Trysten.

¶11 When defense counsel asked Blake whether Trysten dragged Erin out of the truck, Blake testified that he could not remember. Defense counsel then had the following colloquy with Blake:

> Q: But you told—the day after you told Agent McDermott that that's what happened.
> A: I got T-boned by a semi two Septembers ago. I don't have a very good memory. I'm sorry.
> Q: And in your written statement the day of the incident, you said the same thing.
> A: Okay.
> Q: So, now you don't remember saying it or you believe it could've happened?
> A: I believe it could've happened.
> Q: Okay.
> A: I have a hard time remembering, I'm sorry.

¶12 In closing argument, Erin's trial counsel asserted that "Blake Annis testified to you that Tryst[en] was yelling and angry and threatening and then jerked our client out of the pickup onto the ground." Defense counsel also argued that "[t]here's no requirement under the law that you get beaten nearly to death before you can defend yourself." Erin points to Blake's testimony and his trial counsel's opening and closing arguments as evidence of this physical altercation. Blake, however, testified only that he could not remember whether Trysten threw Erin out of the truck. The defense did not attempt to impeach Blake's lack of memory with his written statement or testimony from law enforcement.

6

¶13    Grayce and Nate also testified about the argument between Trysten and Erin. From inside the house, Nate heard a "[s]pirited, but not physical" argument about who was going to drive. Grayce testified that although Trysten raised his voice at Erin, she saw no physical altercation between the two at any point that evening. Josie agreed that Trysten did not get into a physical altercation with anyone. Erin's theory on appeal depends largely on his argument that Trysten, a larger man, dragged Erin out of the truck and threw him on the ground. The logical inference, Erin argues, is that after suffering this "use of unlawful force against him," Erin reasonably believed he needed to defend himself when Trysten "pursued" him through the stubble field. But there is no evidence in the record to show that Trysten threw Erin out of the truck. "[S]tatements of counsel are not evidence," *Stuart*, ¶ 22. Counsel's argument at trial cannot form the basis for error in the District Court's refusal to give a justifiable use of force instruction.

¶14    Sonny—the only witness who observed Trysten drive his farm truck out to Erin— testified that Trysten slowly drove out into the field. Sonny stated that Trysten "just puttered around the building and was going down the road" and that Trysten "crawled through" a deep ditch and "just rolled out into the field." Due to its depth, Sonny testified that a person could not drive through the ditch very fast. Erin does not point to any conflicting evidence indicating that Trysten drove threateningly or dangerously towards him. Instead, the record shows that Trysten drove slowly out into the field. It does not provide evidence or support the logical inference that Erin reasonably feared imminent injury or death.

¶15    Likewise, the record does not indicate that Trysten fired at Erin from inside the farm truck. Law enforcement photographs of the farm truck's interior show two rifles beneath a safety vest. The detective who processed the farm truck testified that blood was deposited on top of the vest, "indicating a sequence of events that the vest was in place before the bloodletting and the blood was deposited on top." The State also presented testimony indicating that the diameter of the bullet hole in the farm truck was too large to have been caused by either of the rifles in the truck. Erin does not point to conflicting record evidence suggesting that Trysten fired at him from inside the truck. The bullet hole therefore has no tendency to show that Erin reasonably believed he was in imminent danger of serious bodily injury or death.

¶16    Erin highlights Blake's and Grayce's testimonies that they heard multiple gunshots around the time Erin shot Trysten. Sonny, on the other hand, testified that he heard a single, "almost simultaneous[]" gunshot as Trysten opened the farm truck's door and before Sonny began running toward the truck. Nate stated that he did not see Trysten with a firearm after they returned to Trysten's house from their drive in the mountains. Additionally, the State presented testimony demonstrating that the cartridge casings recovered from the crime scene were too large to have been fired by the rifles in the farm truck. Sonny also testified that he heard more gunshots while he was performing CPR. Considering the record as a whole, Blake's and Grayce's testimonies that they heard multiple gunshots alone could not support a justifiable use of force instruction when Sonny heard a single gunshot before he ran to Trysten, there was no evidence that Trysten had fired or wielded a gun, and the

recovered cartridge casings could not have come from the rifles in the farm truck. This testimony would support only an inference that Erin may have fired multiple times.

¶17     Last, Erin argues that the calls to his father and Siller provided evidence for the justifiable use of force instruction. Erin, however, called his father expressing fear only after he had shot Trysten. After he heard the gunshot, Sonny testified that he "heard Erin talking to somebody on the phone saying he just killed a guy." This is consistent with Erin's father's testimony that Erin "told me he had shot somebody." Erin does not point to evidence indicating that this fear was reasonable—or that his fear arose before he shot Trysten and presumably expected the others may react with violence. The record indicates that Trysten never threw Erin out of the car; that Trysten drove slowly out into the field; and that Trysten did not discharge a firearm at Erin. Erin's calls to his father and Siller do not provide evidence that Erin reasonably believed he was in imminent danger of serious bodily injury or death at the time he fired the fatal shot.

¶18     The District Court did not abuse its discretion when it determined that the trial record did not support a justifiable use of force instruction. *See* § 45-3-102, MCA; *Daniels*, ¶ 38. Erin has not shown conflicting evidence presented at trial that required the court to instruct the jury on justifiable use of force. *See Marquez*, ¶ 17.

## CONCLUSION

¶19     The conviction is affirmed.

/S/ BETH BAKER

9

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ JIM RICE